## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRCIT OF FLORIDA

Case No. 11-21457-civ-ROSENBAUM/SELTZER

SHACK SHEDRICK, JEROME MITCHELL,
MILTON DAVIS, and JOHN WILLIAMS,

      Plaintiffs,

v.

DISTRICT BOARD OF TRUSTEES OF MIAMI-DADE COLLEGE,

      Defendant

---

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY

---

There is a pervasive pattern and practice of discrimination against black custodians that rings through the employment decisions of the Kendall Campus like a foul odor under a porch. It affects and taints everything it touches.  Frankly, it shocks the conscious that the Defendant would move summary judgment asking for a *complete* dismissal in a case so highly inappropriate for such relief.  Putting aside that this is a discrimination case, where issues of intent and credibility (which predominate in discrimination cases) are best resolved for juries,[1] this case has *mountains* of evidence that demonstrates racial discrimination by the Defendant.

Said simply, the Court should deny Defendant's motion because Plaintiffs possess sufficiently strong evidence of discrimination (composed of circumstantial and *direct* evidence) invalidating the *McDonnell Douglas* burden shifting test the Defendant argues under.  Second,

---

[1] *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3rd Cir. 2008) ("Summary judgment is to be used sparingly in employment discrimination cases"). *See, e.g.*, *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 325 n. 9 (3d Cir. 2003) ("In employment discrimination cases, the summary judgment standard is 'applied with added rigor' because 'intent and credibility are crucial issues.' ") quoting Robinson v. PPG Indus. Inc., 23 F.3d 1159, 1162 (7th Cir.1994); *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 873 (7th Cir. 2002) ("We apply the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on issues of intent and credibility."); *Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC*, 471 F.3d 843, 845-46 (8th Cir. 2006) ("summary judgment is to be used sparingly in employment discrimination cases"); *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1117-18 (8th Cir. 2006) ("We have stated that summary judgment should be used sparingly in the context of employment discrimination and/or retaliation cases where direct evidence of intent is often difficult or impossible to obtain.").

the Plaintiffs have established a prima facie case of discrimination.  Third, the Plaintiffs can demonstrate triable issues of material fact as to whether the employer's so called explanations are false and pretextual.  Fourth, Defendant's make a number of arguments they waived when they failed to plead those arguments in their affirmative defenses.  Lastly, Defendant's failed to comply with the Court's Order (Dkt. No. 74) and Local Rule 56.1 by not filing a separate motion of undisputed facts.

## 1. Factual Background: What this Case is really About.

This case concerns a group of black and African American custodians who claim that the Defendant, through Dean Gloria Baez's administration[2] discriminated against them and other black custodians because of their race and color.  They claim the discrimination was a regular, campus wide, and that an obvious pattern and practice of discrimination appears when a fact finder reviews the evidence.

They claim the discrimination was carried out in a number of ways, including, using racial slurs and names to refer to the black custodians, including the plaintiffs, along with constant harassment, peppering the personnel files of black custodians with inaccurate write-ups, then failing to sufficiently investigate rebuttals to the those write-ups, treating black employees less favorably compared to non-black employees, using subjective employment policies that give unfettered discretion to management, then failing to follow their own policies or deviating from their policies when it aided the discrimination, and finally retailing against those who spoke out against the administration creating an environment of fear to prevent rebellion.

## 2. When a Plaintiff presents "Direct Evidence," as they do here, they avoid Summary Judgment and the Court is to ignore *McDonnell Douglas*.

In 1985, the Supreme Court in *Trans World Airlines, Inc. v. Thurston*, explained that the *McDonnell Douglas* burden-shifting test is "is inapplicable where the plaintiff presents direct

---

[2] Gloria Baez was the Director of Custodial Services and then the Dean of Campus Services for the Kendall Campus of Miami-Dade College.  She held these two positions for what is essentially the relevant time period in this action: 2006 to 2011.

evidence of discrimination."[3]  Later, in 2003, the Supreme Court in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), explained not only is the *McDonnell Douglas* test to be ignored when direct evidence is presented, but that a plaintiff need only demonstrate by either direct or circumstantial evidence, that the employer was "*motivated*" to take adverse employment action for an unlawful reason.  If a Plaintiff can do that, the rest is up to the jury.  The Defendant in this case ignores the direct method of defeating summary judgment by improperly focusing on *McDonnell Douglas*.[4]

Articulating what "direct evidence" means, the Eight Circuit in *Griffith v. City of Des Moines*,[5] explained direct evidence *doesn't* exclude circumstantial evidence and is instead simply evidence of *any* nature that shows some link between adverse action and alleged discriminatory behavior so as to allow a jury to conclude race may have been a motivating factor:

> [A] plaintiff may survive the defendant's motion for summary judgment in one of two ways. The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. **Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury**, regardless of whether his strong evidence is circumstantial. (emphasis added)

Following the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, the District of Indiana in 2007, in *Duncan v. Fleetwood Motor Homes of Indiana*, summed up the standard Plaintiffs should reach when defending a summary judgment, noting that a plaintiff may present "direct or circumstantial [evidence] to create *a triable issue* of whether adverse employment action had

---

[3] *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination").

[4] *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002) ("In addition, under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the McDonnell Douglas framework does not apply in every employment discrimination case. For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case.").

[5] 387 F.3d 733 (8th Cir. 2004) (citations omitted).

*a discriminatory motive.*"[6]  As the Seventh Circuit explained as recently as 2007, in *Sun v. Bd. Of Trs. Of Univ. of Illinois*:[7]  for the purposes of the direct method of proof, circumstantial evidence demonstrating intentional discrimination includes:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or ***comments directed at other employees in the protected group;*** (2) evidence, **whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment**; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. (emphasis added)

Here, the record demonstrates a finding of direct evidence so as to create triable issue for a jury on whether the Defendant had a discriminatory motive.  The evidence is plentiful, comes in many forms, including direct evidence.[8]

### a.  The Plaintiffs "direct" evidence.

The Defendant claims there is "*no evidence*" in the record to suggest race was a possible motivating factor or that one race was treated more favorable than the Plaintiffs.[9]  Plaintiffs have no idea what record the Defendant reviewed.    There is so much evidence, the Plaintiffs are forced to choose examples and summarize it in a chart.  Here's what we mean:

| What the Evidence is Offered to Show | Evidence itself (be it testimony, circumstantial, statistics etc...) |
|---|---|
| Evidence concerning racial slurs discussing African Americans in general and *specifically* about a Plaintiff in this case. | Angel Navarro, a former maintenance worker for the Defendant testified about a conversation he had with his friend, neighbor and co-worker, Tina **Wood**, who just so happens to have been the Director of Campus Services (and number 2 in charge of campus services for the Kendall campus, and who played a large role in firing Plaintiff, Shack Shedrick's; what Ms. Wood said to him he said:[10] |

---

[6] *Duncan v. Fleetwood Motor Homes of Indiana Inc.*, 2007 WL 114185, *5 (N.D. Ind. 2007) (emphasis added); *See also Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006)("For [Plaintiff] to defeat summary judgment in this manner, [a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class.").

[7] *Sun v. Bd. Of Trs. Of Illinois*, 473 F.3d 799, 812 (7th Cir. 2007).

[8] Evidence that does not quite rise to level of direct evidence can sometimes end the defendant's summary judgment request. *See Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n. 4 (11th Cir. 1998) ("Language not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case.").

[9] D's Brief at Pg. 2

[10] Tina Wood was recently demoted from her possession of Director of Campus Services to Administrative Assistant, but survived in this director's position during much of the relevant time period that affects the Plaintiffs. Indeed, as

| | |
|---|---|
| | **"I had a conversation with Shack today. He called in sick and this N*gger thinks that I'm stupid and he wasn't sick and he was at a party."**[11]<br><br>As Navarro explained in his deposition: I used to go a lot by her [Tina Wood's] office.  We're friends.  We're neighbors.  She said, "if it wasn't for some of this N*ggers things would be running fine," referring to the Kendall campus.[12] |
| Evidence concerning racial slurs discussing African Americans | Miguel Ramirez, the former "Director of Custodial Services" said in his sworn declaration that:<br><br>"During my time [as Director of Custodial Services] I was told to get rid of certain black employees even though their firing was not justified…(through Gloria **Baez**, Tina **Woods** and Omaira **Gill**) …. They asked me to lie concerning someone's status to return to work"<br><br>"I complained before about how **Omaira Gill** was racist and how I heard her using the 'N' word" |
| Evidence concerning racial slurs discussing African Americans<br><br>Treating races differently | In what can only be described as *shocking*, when questioned about Director of Custodial Services Ramirez's aforementioned comments during her deposition, ADA Coordinator, Dr. Ruff said it was Director Ramirez who was using racist language and favoring races other than black.<br><br>As Dr. Ruff testified, she did an investigation and found that indeed there was leadership at the Kendall Campus using racist language and disfavoring black custodians, but that it was Ramirez, testifying that she found Ramirez "favored a particular nationality of people over black people …"[13]<br><br>And that indeed it was Director Ramirez who would call black custodians "monkeys, gorillas, that kind of thing."[14] |
| Racial slurs or comments | As Plaintiff Jerome Mitchell testified,<br><br>"One morning Dan Sisk walked up to the warehouse and said something about: You all look like a bunch of monkeys."[15] |
| Pattern & practice of | Dr. Joy Ruff, who was the Defendant's corporate representative, |

she testified, she served in this capacity from 2008 to June of 2012.  See Exhibit 6 – Deposition of Tina Wood at Pg. 10.

[11] Exhibit 1 – Depo of Navarro Pg. 6. (Shack's calling in sick for an asthma attack and later coming to work to pick up his check would ultimately be the reason offered by the Defendant for his termination).

[12] Exhibit 1 – Depo of Navarro Pg. 7.

[13] Exhibit 3 – Depo of Dr. Joy Ruff (Day 2) Pg. 44.

[14] Exhibit 3 – Depo of Dr. Joy Ruff (Day 2) Pg. 19 and 34.

[15] Exhibit 17 – Depo of Jerome Mitchell Pg. 117.

| | |
|---|---|
| discrimination affecting the Kendall Campus<br><br>Against black and African American custodians being treated worse than other races and ethnicities with the Baez Administration | along with its Employee Relations Director, ADA Coordinator, and Director of Equal Opportunity Programs,[16]  testified about the pattern and practice of the stuck out to her when considering allegations of discrimination against the Defendant:<br><br>**Question**: "Is there a particular department within the college that received more charges of complaints of discrimination during the years of 2005 to 2011"<br><br>**Answer**: "More on Race. Kendall Campus custodial services."[17]<br><br>**Question**: My question is what, if anything, stuck out in your mind about that division as it relates to charges of racial discrimination during the years of 2005 to 2011?<br><br>**Answer**: "Well the complaints were for the large part from black custodians, that contained similar components, … that there were folks that weren't black who were not discriminated against. … Things related to comments that allegedly made by supervisors, specific names of supervisors, and excessive write-ups, and issues with the administration.  With the Dean of Administration."[18] |
| Pattern & practice Dr. Joy Ruff recognized is verified through statistics | From 2005 to 2011<br>    • 157 Hispanic custodians were hired<br>    • However only 67 black custodians were hired<br>    • 70% of hires were Hispanic<br>    • Source: Dr. Joy Ruff the schools ADA Coordinator Report pursuant to Court's Order on Plaintiff's Motion to Compel.[19] |
| Pattern & practice Dr. Joy Ruff recognized is verified through statistics | In the 2006 year, when Gloria **Baez** became Director of Custodial Services and then Dean of Campus Services for the Kendal Campus, suddenly <u>39 black</u> custodians were let go compared to only 10 Hispanic custodians.  Baez claims she reviewed their files.[20] |
| Statistical Evidence that the college wide policies led to discrimination, even if it was more pervasive on the Kendall Campus because of the Baez led administration. | From 2005/06 year to 2011 college wide:[21]<br><br>    • Black Custodians were reduced by 11%<br>    • Hispanic custodians increased by 11% |
| Treating races differently<br><br>Not hiring black custodians | Testimony revealed that when black candidates were being considered, there candidacy was thoroughly discouraged, if not outright denied, as Shack Shedrick testified: |

[16] Exhibit 2 – Depo of Dr. Joy Ruff (Day 1) Pg. 23-24.
[17] Exhibit 2 – Depo of Dr. Joy Ruff (Day 1) on 6.18.12 Pg. 72.
[18] Exhibit 2 – Depo of Dr. Joy Ruff (Day 1) on 6.18.12 Pg. 74.
[19] Exhibit 4 - ADA Coordinator Report pursuant to Court's Order on Plaintiff's Motion to Compel.
[20] Exhibit 4 - ADA Coordinator Report pursuant to Court's Order on Plaintiff's Motion to Compel.
[21] See Exhibit 20 - Miami Dade Employee Breakdown by Race and Working Division from 2005/06 School Year to 2010/11 School Year.

| | |
|---|---|
| | *"this was a situation where the qualified candidate, ... was a black male who he had interviewed and he [Mark Mills] was about to give the position to and once Gloria Baez found out that Mark Mills was getting ready to hire a black male, there was .... a conversation amongst the two where Gloria Baez chewed Mark Mills .... There were several positions that became available and Mr. Mills indicated that he was chewed out by Gloria Baez and a Hispanic female was given that position."*[22] |
| Subjective and Meaningless Employment Policies that allows discrimination to permeate | The Defendant does not have a meaningful grievance procedure to stop discrimination.  This is because it "encourages" informal resolutions at the discretion of management.  This in turn, allows discrimination to exist because informal and confidential complaints go unknown, unchecked, and remain out of the public's eye.

Indeed, Policy 1665 is the School's policy on "Discrimination and Harassment Grievance Process."[23]  While the policy name sounds nice, page 4 section D, titled "Informal Resolution of Complaint" encourages complaints of discrimination to be handled informally. It goes on to note that it is not mandatory that the complaints go further than informal resolution, even when they are not resolved.[24]

Further, deposition testimony revealed that the College actually handles the investigation of these charges confidentially and discretely.  As Dr. Ruff testified, "we try to discreetly handle the investigative process" and further "we share information with people on a need to know basis..."[25]

Corroborating Dr. Ruff's statements is Roy Augustus, a custodial supervisor who testified that when he spoke to ADA Coordinator Ruff, concerning charges of discrimination being investigated that he was told these types of things are "confidential" and never to discuss what was said during their meetings. Pg. 31 |
| Subjective and Meaningless Employment Policies that allows discrimination to permeate | The informal handling of discrimination charges is further exacerbated by the Defendant's policy on performance standards. Indeed, College Policy 2410 on Performance Standards contains a list of standards expected to be followed, including, the ever subjective standard of  subsection "q" on pg. 4 which informs employees they are not engage in "conduct that is unbecoming of a college employee." |

---

[22] Exhibit 21 - Shedrick Deposition Pg. 145.
[23] Exhibit 5 – College Policy 1665 - Discrimination and Harassment Grievance Process.
[24] Policy specifically states, "If the complaint cannot be resolved through the informal resolution process, a formal complaint *may* be filed as outlined in this procedure." (emphasis added).
[25] Exhibit 2 – Depo of Ruff, Pg. 63 (Day 1).

| | The Plaintiffs in this case were victims of this policy and subjective standard.  Conduct unbecoming of a college employee can be any conduct management wants in order to write up a black custodian.[26] |
|---|---|
| The effect of the bad policies is peppering black custodians personal files<br><br>Constant harassment | The effect of the subjective employment policies also allows for another form of discrimination against Plaintiffs – the constant harassment and excessive unfounded write-ups.  The idea of course is to pepper an employee's file with write-ups to try and argue a justified firing.<br><br>Indeed this tactic was ongoing at the college.  As Dr. Ruff testified, one of the charges that constantly "flowed" to her office was charges of "excessive" write-ups of black custodians.[27] |
| Constant harassment<br><br>Peppering Black custodians files with baseless write-ups<br><br>Plaintiffs Treated Differently Vis-à-Vis Others[28] | Albert McDuffie, a black Custodial Supervisor, testified in his declaration that:[29]<br>• "The administration would pepper the files of Black custodians with false and/or baseless write ups"<br>• "The administration changed the performance evaluations of many Black custodians."<br>• "The administration harassed Black custodians" |
| Constant harassment<br><br>Peppering files with write – ups | Elnora M. Washington documented the complaints of the black custodians in a September 28, 2007 email when she wrote to campus leaderships and human resources, stating:[30]<br><br>"We Black Custodians are systematically being fired, harassed, and blatantly discriminated against." |
| Racial Slurs and comments<br><br>Treating races differently | Anthony Jones, a black former custodian, said in his declaration:[31]<br>• "I personally heard Eduardo **Padilla** and Mark Mills say that they wanted to "get rid of the old black custodians."<br>• I have also heard Eduardo **Padilla** say "don't mess with my people" referring to Hispanic employees.<br>• I heard the Director of Custodial Services, Dan Cyst, say "you all look like two monkeys working on an airplane."<br>• Administration refuses to lighten the workload for Black custodians and paid them "less" and gave them "less desirable work assignments." |

---

[26] This point was made in *Sandell v. Taylor-Listug, Inc.*, 188 Cal.App.4th 297, 316 (2010) where the court stated "Further, in light of the fact that [the decision maker's] complaints about [the plaintiffs' performance were often subjective, one could reasonably infer that these complaints, and the negative performance evaluation, were themselves motivated by discriminatory animus."
[27] Exhibit 2 – Depo of Dr. Joy Ruff (Day 1) on 6.18.12 Pg. 75.
[28] *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination.") (quotation marks and citation omitted).
[29] Exhibit 10 – Declaration of Albert McDuffie.
[30] Exhibit 15 – September 28, 2007 Email from Elnora M. Washington reporting discrimination.
[31] Exhibit 11 – Declaration of Anthony Jones.

| | |
|---|---|
| Racial Slurs and comments<br><br>Treating races differently | Maximo Castaneda, a Hispanic former maintenance worker said in his declaration that:[32]<br>• "black employees would get less desirable work, often the dirties, worst assignments"<br>• "Hispanic employees had their assignments more appropriately staffed."<br>• "I overhead **Gloria Baez** and Rick Branan saying they were going to fire the older black custodians and that black custodians were generally lazy"<br>• "The Administrative Division as lead **by Gloria Baez** generally created a discriminatory environment against black employees." |
| Racial slurs and comments<br><br>Treating races differently | Roosevelt Austin, a former black custodian said:[33]<br>• "I have heard **Omaira [Gil]** say black people are lazy."<br>• Gloria Baez harasses and treats black custodians differently |
| Racial slurs & comments | Angel Navarro, a Hispanic former maintenance worker for the Defendant testified about other key Kendal campus leaders use of racial slurs and comments:<br><br>"She [**Omaira Gil**] was saying 'all these N*ggers are lazy I can't wait to keep on bringing Hispanics.'"<br><br>**Gloria Baez** referred to black custodians as being "lazy."<br><br>Such comments are not stray remarks.[34] |
| Treating races differently | Roy Augustus, a black custodian supervisor, who still works for the college and feared for his job during his deposition, was brave enough to testify that he was told by his former supervisor, Eduardo Padilla, then the Director of Custodial Services, to "***forgive***" four Hispanic employees he wrote "because they're good employees."[35]<br><br>Having no choice he did. He was then instructed by Mr. Padilla that "whenever" he is going to write-up and employee, to "come to him first."[36] |
| Treating races differently | As Plaintiff Jerome Mitchell, testified concerning the job assignments and shifts custodians got: |

[32] Exhibit 12 – Declaration of Maximo Castaneda.
[33] Exhibit 14 – Declaration of Roosevelt Austin.
[34] Besides the fact Baez, Woods, Padilla, Gil and company are all key leaders of the Kendall campus leadership making management decisions, the discriminatory comments are not "stray remarks" because they are relevant to show the corporate culture in which the College makes its employment decisions and may be used to build a circumstantial case of discrimination. *See Mangold v. California PUC*, 67 F.3d 1470 (9th Cir. 1995); *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326 (3rd Cir. 1995); *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1214 (3rd Cir. 1995); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641 (3rd Cir. 1993); *Cline v. Roadway Express., Inc.*, 689 F.2d 488 (4th Cir. 1982).
[35] Exhibit 16 – Depo of Roy Augustus Pg. 27.
[36] Exhibit 16 – Depo of Roy Augustus Pg. 26-27.

| | |
|---|---|
| | "From working in the warehouse, I know who was coming in the mornings, like at 7:00 and 8:00 in the morning, and I know who was coming in at 12:00, and so over the time period that she got there, I could see the difference in people"[37] |
| Employer's Hidden and "Sealed" Document Policy | As outlined above, the subjective personnel standards leads to constant complaints of excessive write ups by black custodians.  The confidential grievance and investigatory process leads to charges of discrimination being taken out of the public's eye.  But what's worse is when a write of a is deemed false or baseless, the write up isn't removed from the personnel file, instead the documents are "sealed" according to ADA Coordinator, Dr. Joy Ruff.   This policy further allows discrimination to foster because it is covering up the violators who are writing up employees excessively without a reasonable basis.<br><br>The question and answer session with Dr. Ruff exposed this practice:<br><br>**Question**: But if it turns out that that the write-up is not accurate, what happens to the write-up?<br><br>**Answer**: The write-up is not removed, but the write-up is sealed. It's sealed. The documentation indicates that it's not to be opened except by the Vice Provost for Human Resources or their designee. So people don't have access to it.<br>*See* Exhibit 2 – Depo of Dr. Joy Ruff (Day 1)  pg. 100<br><br>As she went on to note, this practice "has been in place since my coming to Human Resources … in about 1996, 97."  Exhibit 2 –Pg. 102 |
| Changing key personnel information | Professor Nancy Wilson Young said in her declaration:[38]<br><br>"The administration in cohort with the Human Resources Department, has falsified, changed, and/or manufactured information and placed it in personnel files" when it came to black employees of the college. |
| Following Policies and Practices when it's convenient for the Defendant | Despite the subjective policies that allowed the Baez led administration to discriminate against the black custodians, the Defendant will still choose not to follow its own policies when it is convenient for them.  This was exposed first because an incident with Shack Shedrick.<br><br>Mr. Shedrick was written-up because he refused to hand his keys over to Eduardo Padilla, a Hispanic custodial supervisor.  His reasoning was that because the policy of Miami Dade College was to not give your keys out but rather secure them in a boxed location so there would be a record of the chain of custody, he decided to follow |

---

[37] Exhibit 17 – Depo of Jerome Mitchell, Pg. 52.
[38] Exhibit 13 – Declaration of Professor Nancy Wilson Young.

| | the policy. He was written up. "Kendall Campus leadership concluded that [Shedrick] should have given the keys to his supervisor."[39]<br><br>However, Dr. Ruff later admitted in her deposition that despite her EEOC response that Kendall Campus leadership (aka Beaz and company) concluded the keys should have been given his supervisor, leadership actually said the "policy was to put the keys back in the box." And further that, "Yes. **Mr. Shedrick was correct; it was the policy to put the keys back in the box**."[40]<br><br>Still Mr. Shedrick was written up, and no letter of apology or removal of this write-up has taken place.[41] |
|---|---|
| Following Policies and Practices when it's convenient for the Defendant and not following the progressive discipline policy | Gloria Baez testified that Progressive Discipline Policy must be strictly followed and that she *always* followed it.[42]<br><br>Tina Wood testified that she knows that the progressive discipline process does not have to be followed if Baez says so.[43] |
| Key leadership not aware of a policy against discrimination | In perhaps the most shocking admissions, former Director of Custodial Services, Tina Wood, testified that she wasn't even aware of a policy that existed on racial discrimination or how to handle complaints of discrimination. She said she would just tell Gloria Baez.[44] |
| Treating Races Differently | Dean Gloria Beaz testified she was aware of at least some Hispanic custodians getting paid more than black or African American custodians. The one example she recalled was because the Hispanic women had a high school diploma trying to justify that this higher level of education somehow means a custodian will perform their job better and that's why she was paid more.[45] |
| Treating Races Differently | Milton Davis was not allowed to take classes during working hours while Hispanic custodians were.[46] |

---

[39] Exhibit 7 – EEOC Response to Shedrick's Charges prepared by Dr. Joy Ruff; *See also* Exhibit 3 – Depo of Dr. Joy Ruff (Day 2) Pg. 83.

[40] Exhibit 3 – Depo of Dr. Joy Ruff (Day 2) Pg. 83.

[41] Here another example of why the Defendant's offered reasons for disciplined and termination are pretext. They cannot be believed when they do not stick to their own policies. *See Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282 (10th Cir 2007) ("An employer's failures to follow written or unwritten policy may support a showing of pretext"); *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286 (11th Cir. 2006) ("Similarly, an employer's deviation from its own standard procedures may serve as evidence of pretext."); *Rudin v. Lincoln Land Community Coll.*, 420 F.3d 712, 727 (7th Cir.2005) ("An employer's failure to follow its own internal employment procedures can constitute evidence of pretext.").

[42] **Question**: Do all full-time employees have to go through these steps [of progressive discipline]? **Answer**: Yes **Question** Are there any exceptions made? **Answer**: Not under my division." Exhibit 9 – Depo of Gloria Beaz Pg. 75.

[43] Exhibit 8 – Depo of Tina Wood Pg. 33-34 (Answer: I know that it can be done but I don't recall an exact time [it was done]. Referring to the steps of progressive discipline.).

[44] Exhibit 8 – Depo of Tina Wood Pg. 31-32.

[45] Exhibit 9 - Depo of Gloria Beaz Pg. 70-71.

[46] Exhibit 19 – Depo of Davis 64-66.

| Circumstantial Evidence | • Gloria Baez - "resigned"<br>• Tina Woods – "demoted"<br>• Eduardo Padilla – Contract not "renewed"<br>• Who was hired to replace Ms. Baez? Answer: an African American man. |
|---|---|
| Retaliation | • Professor Nancy Wilson Young said "I have seen countless Black custodians report to HR to contest a write-up or reprimand, only to be further reprimanded by the administration."[47]<br><br>• But perhaps former custodian Austin said it best, when he said in his sworn declaration that "Ms. Baez Ms. Woods, and Ms. Gil were very retaliatory.  If people tried to speak out against the discrimination they would find a way to bury you and make sure they got rid of you or you were punished in some way to discourage future such complaints."[48]<br><br>• Maximo Castenada described the corporate culture when it came to retaliation stating "I know that the administration is majority Hispanic and it is often referred to as the 'Miami-Dade mafia' for its tendency to stick together and no prisoner attitude toward what it wanted."[49] |

Accordingly, the Defendant is not to be believed when it says there is no evidence in the record of discrimination.  But more importantly, the above constitutes "direct evidence" which as the Sixth Circuit explained in *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."[50]  The consequence of which makes *McDonnell Douglas* burden-shifting test "inapplicable" and causes the Defendant's summary judgment brief to be denied.[51]

### 3.  Even though the *McDonnell Douglas* test is inapplicable, the Plaintiffs still meets the *prima facie* elements for racial discrimination.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court articulated a three-part burden shifting test to be used in those cases where direct evidence of discrimination

---

[47] Exhibit 13 – Aff. of Prof. Nancy Wilson Young Pg. 17.
[48] Exhibit 14 – Declaration of Roosevelt Austin ¶ 10.
[49] Exhibit 12 – Aff. of Maximo Castaneda ¶ 16.
[50] *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).
[51] *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination").

was lacking.  The test was created because direct evidence of discrimination is rarely available.
As the Second Circuit recognized in *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d
Cir. 1988), "Direct evidence of discrimination is difficult to find precisely because its
practitioners deliberately try to hide it."  This makes Plaintiffs unearthing of it as set out in the
preceding section remarkable.[52]

   Still, the Plaintiffs have met the prima facie elements of the *McDonnell Douglas* test.  As
defense counsel pointed out in her brief, a plaintiff is *generally*[53] to show:[54]

   (1) Plaintiff belongs to a racial minority;
   (2) Plaintiff was subjected to an adverse employment action;
   (3) Plaintiff was treated less favorably than similarly situated employees who were not
       members of the minority class; and
   (4) that Plaintiff was otherwise qualified for the position.

There is no dispute between the parties as to element one, as the Plaintiffs are all black and
African American.[55] There also is no dispute that adverse action was taken against them
constituting element two, as all four Plaintiffs claim they were constantly harassed or
disciplined, and ultimately terminated or forced to resign.[56]

   The element most closely litigated, is of course, whether there is any evidence to suggest
another race was treated more favorable then the Plaintiffs.'  In this case, however, the evidence
is noticeably *not* lacking as demonstrated in section 2. And not to re-hatch this laundry list
again, some additional examples can be highlighted to make the point.

---

[52] California's Court of Appeals for the Fourth Circuit said it best in *O'Mary v. Mitsubishi Electronics America, Inc.*, 59 Cal.App.4th 563, 575, 69 Cal.Rptr.2d 389, 379 (Cal. 1997):
> On those occasions when there is evidence of clear discriminatory intent, it is like a gold nugget which just happens to be lying on the ground. You do not throw it away as if it were so much dross. To put the idea in typical evidentiary terms, evidence of clear discriminatory intent is overwhelmingly probative in a discrimination case because it shines a spotlight on the very thing which is the focus of the litigation.

[53] Plaintiffs say "generally" because these elements are not fixed.  As the Supreme Court said in *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983), "The prima facie case method established in McDonnell Douglas was 'never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'"

[54] D's Brief at 18-19 citing *Chambers v. Walt Disney Co.*, 132 F. Supp. 2d 1356 (M.D. Fla. 2001).  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *see also Leslie v. United Technologies Corp.*, 51 F. Supp. 2d 1332, 1340 (S.D. Fla. 1998).

[55] D's Brief Pg. 4 ¶ 1 (Shack Shedrick a black male); Pg. 8 ¶ 1 (Milton Davis an Africa American male); Pg. 10 (John Williams a black male); Pg. 12 ¶ 1 (Jerome Mitchell a black male).  Title VII's ban on race and color discrimination encompasses discrimination based on the shade of a person's skin color.  *See* EEOC Compliance Manual, §15-III.

[56] D's Brief Pg. 7 ¶ 10 ("Shedrick was ultimately given the choice by Miami Dade to either voluntarily resign or be terminated in January, 2009 …").

Albert McDuffie, a former custodial supervisor, who managed the custodian's during the night shift (which included some of the Plaintiffs), testified in his sworn declaration that "the administration would pepper the files of [b]lack custodians with false and/or baseless write ups."[57] He explained that Gloria Baez instructed him to have Plaintiff Shack Shedrick strip the floors that evening, but that he informed her that Shack had provided a doctor's note indicated that he was not to be exposed to chemical fumes.[58] A few days later McDuffie says he was "instructed by Eduardo Padilla to write up Shack for failing to strip the floors," even after explaining Shack's work restriction.[59] As McDuffie said, "Shack was still written up."

This peppering of files was not done of course to Hispanic employees. The evidence Plaintiffs found during their investigation came from both black and Hispanic employees confirming it was directed towards black and African American employees of the Kendall Campus.[60] Adding insult to injury, when a black custodial supervisor wrote up Hispanic employees he was required to "*forgive*" those employees and could no longer write-up employees until getting permission from Hispanic Director of Custodial supervisors Eduardo Padilla.[61] As Shack Shedrick testified about this incident:

> "*Eduardo Padilla had exonerated four Latin employees[62] and he was completely tarnishing the black employees' files by constantly harassing, attacking, reprimand[ing] and belittling the black employees that worked within Campus Services.*"[63]

---

[57] Exhibit 10 – Declaration of Albert McDuffie ¶ 10-11; See Exhibit 13 – Affidavit of Nancy Wilson Young ¶ 11 "Baez [and company] began to create write-ups to justify the termination of Black custodians." *See also* Exhibit 14 - Declaration of Roosevelt Austin ¶ 5 ("black custodians were treated differently than non-black custodians … they were constantly harassed forced to experience racial comments, written-up for bogus reasons."); Exhibit 12 – Affidavit of Maximo Castenada ¶ 10 ("black employees were treated differently … black employees were constantly getting written up.").
[58] Exhibit 10– Declaration of Albert McDuffie ¶ 11.
[59] Exhibit 10 – Declaration of Albert McDuffie ¶ 11.
[60] *See* Exhibit 10 – Declaration of Albert McDuffie ¶ 9, 11 noting that discrimination and write-ups was directed towards black custodians.  See Exhibit 13 – Affidavit of Professor Nancy Wilson Young, Declaration of Anthony Jones (Ex. 11), Declaration of Maximo Castaneda (Ex. 12), and Declaration of Roosevelt Austin (Ex. 14) all regarding the same. *See also* Ex. 15 – Sept. 28, 2007 email from Elonra M. Washington (regarding the same).
[61] Exhibit 16 – Depo of Roy Augustus Pg. 26-27.
[62] These four employees were custodians. See Exhibit 21 –Shedrick Deposition Pg. 54.
[63] Exhibit 21 – Depo of Shedrick Pg. 49-50.

> *"Roy Augustus [the black individual that issued the written reprimands] was made to apologize to the four non-black employees by Eduardo Padilla.  He had to apologize for reprimanding them."*[64]

> *"Ed Padilla then informed Roy that he was not going to allow them to issue the reprimand to the four Hispanic employees"*[65]

Job assignments, work schedules, and staffing where all assigned with preferential treatment.  As Jones testified, "[t]he administration knowingly and continuously subjected [b]lack custodians to unsafe working conditions."[66]  He cited an example, pointing to how group black custodians were ordered by the administration to strip floors using potent chemicals.  The custodians complained about potent chemicals and begged the administration to allow the air conditioning to stay on through the evening so they were not breathing the toxins and to cool the work area during the summer months.[67]  McDuffie says he received a reply to this request "from Gloria Baez that air conditioning was not needed."  To put it simply, it didn't matter what black custodians would do or say to try and defend their actions or be treated fairly, they were ignored and treated like trash by the Baez led administration.  As Plaintiff, Milton Davis, testified (when he tried explaining to his supervisor, Assistant Director of Custodial Services, Eduardo Padilla, that another black custodian didn't do anything wrong), he told me to: "*Just get out of my office.*"[68]  Padilla wouldn't even let Milton speak.[69]  As Maximo Casteneda explained, HR was "not interested in listening to explanations from black employees concerning write-ups about them."[70]

Confirming what Davis, Castaneda and others have explained about black custodians being written up for baseless alleged offenses and ignoring the justifications in an attempt to

---

[64] Exhibit 21 –Depo of Shedrick Pg. 53-54.

[65] Exhibit 21 – Depo of Shedrick Pg 162.

[66] Exhibit 10 – Declaration of Albert McDuffie ¶ 14.

[67] Exhibit 1 – Declaration of Albert McDuffie ¶ 14; *See also* Exhibit 18 – Depo of John Williams Pg. 30, 114 (complaining about how black employees had to strip the floors but Hispanics did not. And that he was one of the black employees forced to strip the floors, complaining how they wouldn't even provide proper equipment to him so he could perform the job).

[68] Exhibit 19 – Depo of Davis Pg. 74-75, 77 ("*I tried to explain that Roy had done nothing wrong. Eduardo became extremely hostile and wouldn't let me speak*") (emphasis added).

[69] Exhibit 19 – Depo of Davis Pg. 74-75, 77 ("*I tried to explain that Roy had done nothing wrong. Eduardo became extremely hostile and wouldn't let me speak*") (emphasis added).

[70] Exhibit 12 – Aff. of Maximo Casteneda ¶ 11.

establish a paper trial to fire them, Plaintiff Jerome Mitchell described an example.  Mitchell explained how he asked his supervisor if he could skip signing out of work (an alleged company procedure)[71] because he sustained "*chemical burns*"[72] on his foot when the College did not provide him with the proper safety gear.  He didn't want to walk the entire way back to the security guard house with the bleeding and burning foot.  His supervisor, Omiara Gil, granted his request, and he went to see a doctor.[73]   Adding insult to his already injured foot, he had a "*write-up*" waiting for him the next week.[74]   To make matters worse, he wrote a rebuttal to explain what happened and the permission he received, but when he asked the College if they spoke with his witness they said "*no.*"[75] As Mr. Mitchell testified about this incident and his rebuttal report, I "*would really appreciate the college staff listening to my frustrations and allowing me to just do my job and work.*"[76]

Professor Nancy Wilson Young also took note of discrimination between the races explaining, "I have seen the administration blatantly deny black custodians light work duties requested and documented by their respective doctors upon return from injury."  So did Roosevelt Austin as he noted in his sworn declaration: "there is no doubt that black custodians were treated differently than non-black custodians.  Black custodians were given the less desirable work assignments .... I know black employee would more regularly have to do the worst custodial job in the entire college, which was stripping floors."[77]  Hispanic maintenance employee Maximo Castaneda further confirms these complaints, explaining in his affidavit that "black employees would get the less desirable work, often the dirtiest, worst assignments, while the Hispanic employees would get the easier and more desirable assignments.  In addition, Hispanic employees had their assignments more appropriately staffed so that the work was

---

[71] Exhibit 17 – Depo of Mitchell Pg. 42.
[72] *Id.* at Pg. 38.
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] Exhibit 14 – Declaration of Roosevelt Austin ¶'s 5, 9.

16

more uniformly distributed."[78]  He explained what he meant by giving examples, citing the

stripping of floors and having black employees perform pressure washing in the winter

months.[79]

Shack Shedrick brought to light a clear example of Hispanic employees getting

preferential work assignments.  Mr. Shedrick testified that Mr. Padilla approached him at the

end of shift to inform him that another custodian, a Hispanic male, was going to be working in

the warehouse after he left.  Mr. Shedrick recommended that this "gentleman wash a load of

dirty mopheads,"[80] but Mr. Padilla responded "he's not going to be washing any mops."[81]

Washing mops is *not* one of the sought after custodial duties; as Mr. Shredrick put plainly: "*that

gentleman did not want the Hispanic employees to do the dirty jobs*.  In fact, the black

employees were going to get the dirty jobs."[82]  Black custodians were also forced to "pressure

clean" during "cold weather" spans, while Hispanic custodians generally did not he testified.[83]

When it came time to reduce the workforce, less tenured Hispanic custodians were kept,

while black custodians were let go.  As Mr. Mitchell testified:[84]

> A: That's why they said they let me go, but how come they didn't let go of the
> Spanish people that were working there with us?

> Q. Did they let go of some of the other Hispanic custodians?

> A: I have no idea, but I know she [referring to a less tenured Hispanic
> custodian] is still working there and she had just started working there, so how
> come they didn't let her go if it was for budget reasons?

Even Gloria Baez admitted that she was aware that some Hispanic employees were paid more

money than similarly situated black custodians.[85]  She tried to explain away that the difference

in education that having a G.E.D. means you can carry out your custodial duties better.  Not only

---

[78] Exhibit 12 – Aff. of Maximo Castenada ¶ 8
[79] *Id.* at ¶ 9.
[80] Exhibit 21 - Shedrick Depo pg. 59
[81] *Id.* at Pg. 60.
[82] *Id.* at Pg. 148
[83] *Id.* at Pg. 149-150
[84] Exhibit 17 - Mitchell Deposition Pg. 130
[85] Exhibit 9 – Deposition of Gloria Beaz (Shedrick v. MDC case) pg. 70-73.

do the Plaintiffs and the courts not buy this,[86] but Omaira Gill recently *admitted* that a high school diploma does not make a difference in a person's ability to accomplish the job duties of a custodian working for the Defendant.[87]

The examples truly go on like this in countless fashion.  It wasn't towards a select group of black employees either, but rather as Shacked testified: "it wasn't just [towards] me.  All of the black employees that worked within the Campus services were being harassed, scolded, reprimanded and later terminated by this administration."[88]  Said simply, by virtue of being black and African American, they were treated less favorably others, predominately the Hispanic employees.  This is reason alone not to believe the Defendant's proffered pretextual reasons for the adverse action taken against them.[89]

The last element, that a Plaintiff was otherwise qualified for the position is not necessary to demonstrate because the same persons who were leading the discriminating took the adverse actions.[90]  The Defendant would have this Court believe that Baez and Wood didn't control HR, but that is simply not true.  As Dean Gloria Baez, J.D., testified in another case where her conduct as it relates to racial discrimination was at issue:

> *"Q: How many times have they [referring to HR] not followed your recommendation?*
>
> *A: They have never not followed my recommendation."*[91]

---

[86] *Albemarle*, 422 U.S. 405 (1975) (Court rejected employer's attempt to justify its use of a verbal exam and high school diploma in connection with promotion decisions).

[87] Exhibit 29 – Depo of Gill [forthcoming].

[88] Exhibit 21 – Depo of Shedrick Pg. 58.

[89] *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination.") (quotation marks and citation omitted); *Russell v. Board of Trustees*, 243 F.3d 336, (7th Cir. 2001). *See also*, *Lynn v. Deaconess Med. Center-West Campus*, 160 F.3d 484, 488-89 (8th Cir. 1998).

[90] The courts have held that a plaintiff need not demonstrate satisfactory job performance where the alleged discriminator is the same individual who judged the plaintiff's job performance inadequate. *See, e.g.*, *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001) ("The district court correctly held that the second prong, meeting the employer's legitimate business expectations, was not necessary to the analysis; the people judging Ms. Oest's performance were the same she accused of discriminating against her.").

[91] Exhibit 23 - Depo of Gloria Baez in Pg. 106  (from *Turner v. Miami Dade College*, 09-22090).  See also Exhibit 9 – Depo of Gloria Baez pg. 129 (from Shack v. Miami Dade College) case testifying that it was "Tina [Wood]" who "was more involved" in firing Shack Shedrick and she didn't really need to do anything more because Shack's personnel file had "enough disciplinary actions."  In other words, Baez peppers them with disciplinary actions in the rest is history. Exactly what the Plaintiffs are claiming.

Still, these four long tenured employees had been recognized for their outstanding service many times by those not controlled by the Baez led administration.  They were well qualified for to perform their jobs. They received positive reviews, certificates of appreciation, and complements from their supervisors and co-workers time and time again.[92]  Omaira Gill, in fact, has admitted that all four Plaintiffs were capable of performing their job duties in a satisfactory manner.[93]

For example, Mr. Shedrick, who began working with Miami Dade College in 1994, was consistency described as "very reliable" and one who "maintain[ed] a very serouis approach to his job duties and responsibilities."[94]  Moreover, both Mr. Shedrick and Mr. Mitchell received the College President's Recgonition of Excellence Award for their outstanding custodial services.[95]  Mr. Williams was also described as always coming to work "in a timely manner."[96]  Additionally, Mr. Mitchell was also described as "responsible and dependable" in 2005 (just prior to Baez taking the reins).[97]  The evidence supports the Plaintiffs positions very seriously, and for their employment history excelled as custodians with Miami Dade College.  But a stack full of positive performance documents doesn't changes common sense, you don't keep your job for approximatley 20 years because you were not able to meets the expectations.[98]

Additionally, any negative comments, or proffered reason for termination and discipline by the College are suspect, pretextual,  and very much in dispute, because the College has a history of fradulently changing documents, sealing them, or otherwise removing information out of the personnel files of black and African American custodians.

Albert McDuffie testified to this, noting "the administration chaged the performance evaluation of many black custodians.  As a Supervisor, I was required to conduct performance

---

[92] Exhibit 22 – numerous positive accolades or reviews.
[93] Exhibit 29 – Depo of Gill [forthcoming].
[94] Exhibit 22 – SS49 ("very reliable"); 000504 (2005 excellence award evaluation).
[95] Exhibit 22 – Shedrick's Recognition of Excellence Award for 2005 (001205) and 2004 (001212); Mitchell's Recognition of Excellence Award for 2005 (001205).
[96] Exhibit 22 – 000342.
[97] Exhibit 22 – 001205 (also stating that he "can be depended upon to be very prompt and extremely regular in attendance").
[98] Williams started in 1990 (Ex. 18 – Depo of Williams Pg. 7); Davis 1983 (Ex. 19 – Depo of Davis Pg. 7); Shedrick since 1991 (Depo of Shedrick Ex. 21 Pg. 10); Mitchell begin working there in 1987, left in 1988 to be invited back in 1999 (Ex. 17 – Depo of Mitchell Pg. 9).

evaluations on the custodians whom I supervised.  On more than one circumstances, **I received back a different evaluation than the one that I submitted to the administration.** The evaluation that I received back would have different content than my original and would have **a forged copy of my signature**. … **One example of a performance review that was changed from my orginal and was forged with my signature was Shack Shedrick's 2006/2007 Performance Evaluation.**"[99]  He also expalined how "personnel files for [b]lack custodians were stolen from [his] office."[100]  And McDuffie wasn't the only one that was aware of the fraudulent changing or removal of key personnel file documents for black custodinas.  As Professer Nancy Wislon Young explained in her sworn affadavit, "the administration in cohort with the Human Reources Department has falsified changed, and/or manufactured information and placed it in personnel files.  I have personally seen this occur during my employment with the College."[101]

In fact, on more than one occasion, the undersigned's investigation into discrimination has led to the discovery of personnel file documents being forged with signatures or key writings.  In Mr. Shedrick case, a write-up about an incident that occurred at work purported to bear his signature and indicating that "*I concur*" was placed next to it, as if to say Mr. Shedrick agreed with the contents of the write-up.[102]  However, Mr. Shedrick testified that this is not his signature and he does not know who wrote it.[103]

In an even more egregious example, Plaintiff Milton Davis, testified that he indeed did turn in a resignation letter (albeit because he was given no other choice)[104] to which he did sign.[105]  However, he later discovered that the College had instead created a fictitious resignation letter and tried to make it like Dean, Gloria Baez, was giving him a choice about the resignation

---

[99] Exhibit 10 – Declaration of Albert McDuffie ¶ 12.
[100] Exhibit 10 – Declaration of Albert McDuffie ¶ 17.
[101] Exhibit 13 – Aff of Prof. Nancy Wilson Young ¶ 12.
[102] Exhibit 21 – Depo of Shedrick Pg. 73.
[103] Exhibit 21 - Depo of Shedrick Pg. 73.
[104] As Gloria Baez testified that all employees being terminated can put in resignations on file.  Question: My understanding is sometimes the college offers employees to resign if they are going to be terminated? Answers: Always Question: They always do that? Answer: Yes. (Depo of Beaz Ex. 9 at pg. 44).
[105] Exhibit 19 Davis Deposition Pgs. 40-41.

and that he had quit on his own without any pressure from the College.[106]  These two sham

documents in personnel files demonstrate that the College's personnel records are not complete

and accurate.  The write-ups and other dicipline handed out are not trustworthy, they are issues

of fact, in dispute, material, and left for a jury to decide.

The examples cited in sections of 1 and 2 that include the failure to follow College

policies,[107] the racial slurs and language,[108] the different treatment to each races,[109] statistics

suggesting racial bias,[110] and evidence of untrustworthy documents and explanation are all alone

sufficient to demonstrate the pretext as to the explanations the Defendant proffered for its

action against the Plaintiffs.  But to put is simply, there is ample evidence from which a fact

finder could conclude that the "asserted justification is false."[111]  Accordingly, this case should go

to the jury.

### 4.  Plaintiffs have established a prima facie case of retaliation.

To establish a prima facie case of retaliation arising from Title VII, a plaintiff must demonstrate direct

evidence or meet the *McDonnell Douglas* burden shifting test of: 1) that he engaged in statutorily

protected expression;[112] 2) that he suffered an adverse employment action; and 3) some causal

relationship between these events.[113]  Both tests are satisfied here[114] and the burden is low.[115]

---

[106] Exhibit 19 – Davis Deposition Pgs. 20-25.
[107] *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286 (11th Cir. 2006) ("Similarly, an employer's deviation from its own standard procedures may serve as evidence of pretext."); Village of Arlington Heights v. Met. Hous. Dev. Corp., 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role").
[108] *See Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n. 4 (11th Cir. 1998) ("Language not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case.").
[109] *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination.").
[110] *Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984) ("This court has pointed out various items of evidence which may be relevant to such a showing of pretext. These items include: (1) the employer's prior treatment of the plaintiff, (2) the employer's general policy and practice with respect to minority employment, *particularly statistics* reflecting a general pattern and practice of discrimination, (3) disturbing procedural irregularities, and (4) the use of subjective criteria, especially when used to evaluate candidates that are not objectively equally qualified.") (emphasis added).
[111] *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d 846, 852-853 (4th Cir. 2001).
[112] This is simply opposition to discrimination. EEOC Compliance Manual Section 8, Chapter II, Part A. *See also Deravin v. Kerik*, 335 F.3d 195, 203 (2nd Cir. 2003) ("[C]ourts have consistently recognized [that] the explicit language of §704(a)'s participation clause is expansive and seemingly contains no limitations.").
[113] *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).

The protected activity and adverse employment action elements are not in question. They all filed charges of discrimination and all complained about how they experienced discrimination complaining and objecting to how they were treated.[116] They were written-up with baseless write-ups multiple times. Lastly, their write-ups and terminations worsened because of their complaints about discrimination and being treated worse than Hispanic employees. For example, Gloria Baez became upset when she missed out an opportunity to retaliate against Shack by quashing his vacation requests, explaining to Mr. McDuffy "I had him. I had him. I had him and you let me down. You're not on the same team as me."[117] Or another example as Shack explained, "I was really trying to avoid being reprimanded, but then after meeting Gloria Baez and Mark Mills, they conspired to do this counseling Memorandum because I went to them."[118]

The retaliation pattern and practice the defendant exhibited towards black custodians is well documented. Professor Nancy Wilson Young said "I have seen countless Black custodians report to HR to contest a write-up or reprimand, only to be further reprimanded by the administration."[119] But perhaps former custodian Austin said it best, when he said in his sworn

---

[114] *See supra* Section 2 for the Direct Evidence  *See also*, *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 642-44 (7th Cir. 2002) (noting direct evidence is proper, and further noting that no proof of causation is necessary). Plaintiffs agree.

[115] *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) ("At the prima facie stage of a retaliation claim, a plaintiff's burden 'is not great; [she] merely needs to establish facts adequate to permit an inference of retaliatory motive.'"). *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2nd Cir. 1994) ("The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the prima facie stage is de minimis."). Even preemptive retaliation may be actionable. *See Steele v. Youthful Offender Parole Bd.*, 162 Cal.App.4th 1241, 76 Cal.Rptr.3d 632 (Cal.App. 2008). In *Steele*, the California Court of Appeal held California's anti-discrimination statute, the Fair Employment and Housing Act, "protects employees against preemptive retaliation by the employer." So will answering questions in an employer's investigation. *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999) ("Here, we recognize that, at least where an employer conducts its investigation in response to a notice of charge of discrimination, and is thus aware that the evidence gathered in that inquiry will be considered by the EEOC as part of its investigation, the employee's participation is participation "in any manner" in the EEOC investigation.") and *Cardenas v. Massey*, 269 F.3d 251 (3rd Cir. 2001).

[116] Exhibit 26 – Internal Complaint of Discrimination filed with related docs.  *See also* Depo of Shedrick Pg. 49 - 50 (stating Eduardo Padilla had exonerated four Hispanic employees, despite following a pattern of harassment, degradation and undeserved reprimands against black employees); *See also* Exhibit 18 – Depo of Williams Pg. 30, 114 (complaining about how black employees had to strip the floors but Hispanics did not. And that he was one of the black employees forced to strip the floors, complaining how they wouldn't even provide proper equipment to him so he could perform the job); Exhibit 19 - Depo of Davis Pg. 66 - 67 (stating he was told he must resign because he wanted to take a class which would cause him to arrive one hour late to work twice per week. However, other Hispanic employees were accommodated for taking classes). *See also* Ex. 17- Depo of Mitchell Pg. 54 - 55 (stating that new Hispanic employees were starting with higher salaries than older black employees).

[117] Exhibit 21 – Depo of Shack Pg. 153.

[118] Exhibit 21 – Depo of Shack Pg. 80.

[119] Exhibit 13 – Aff. of Prof. Nancy Wilson Young Pg. 17.

declaration that "Ms. Baez Ms. Woods, and Ms. Gil were very retaliatory.  If people tried to speak out against the discrimination they would *find a way to bury* you and make sure they got rid of you or you were punished in some way to discourage future such complaints."[120]  Maximo Castenada described the corporate culture when it came to retaliation stating "I know that the administration is majority Hispanic and it is often referred to as the 'Miami-Dade mafia' for its tendency to stick together and no prisoner attitude toward what it wanted."[121]

The offered explanations by the Defendant as to discipline and termination are pretext.  The Plaintiffs have established in the preceding sections the pattern and practice of baselessly handing out discipline and adverse actions in an effort to get rid of Plaintiffs.  Further the discipline and adverse actions hold little to no weight at this stage given the evidence of tampering, fraud, and changed personnel file documents.

**5.  Defendant has Waived those Affirmative Defenses Not Pleaded in its Answer, specifically its 3rd, 4th, and 5th Arguments as It Did Not Comply With Rule 8(c).**

Under Federal Rule of Civil Procedure 8(c), a defendant is required to plead all of its affirmative defenses in its answer.  Failure to plead an affirmative defense constitutes a waiver of that affirmative defense.  *See, e.g.*, *Arizona v. California*, 530 U.S. 392, 410 (2000); *see also Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc.*, 513 F.2d 407, 419 n. 92 (D.C. Cir. 1975).  The policy behind this rule is "the prevention of unfair surprise [and] [a] defendant should not be permitted to lie behind a log and ambush a plaintiff with an unexpected defense." *Ingraham v. U.S.*, 808 F.2d 1075, 1079 (5th Cir. 1987).

**a.  The Court Should Treat Defendant's Sovereign Immunity Defense As Waived Regarding Plaintiff's 42 U.S.C. § 1981 Claim Because This Is An Affirmative Defense That Defendant Failed To Plead In Compliance With Rule 8(c).**

In its Motion for Summary Judgment, Defendant brings forth an elaborate Eleventh Amendment argument in an effort to bar Plaintiffs' 42 U.S.C. § 1981 claims against Defendant.

---

[120] Exhibit 14 – Declaration of Roosevelt Austin ¶ 10.
[121] Exhibit 12 – Aff of Maximo Castaneda ¶ 16.

This argument is an affirmative defense because it does not deny the Plaintiff's allegations; rather, it brings forth the Eleventh Amendment as a means to avoid liability.  *See Royal Palm Sav. Ass'n v. Pine Trace Corp.*, 716 F. Supp. 1416, 1420 (M.D. Fla. 1989) (defining affirmative defenses).    Therefore, as an affirmative defense, Defendant should have brought forth this defense in its Answer to Plaintiff's Complaint.  *See* Rule 8(c); *see also Canadian Overseas*, 528 F. Supp. at 1344 (the term "pleading" does not include motions).  While some courts have viewed sovereign immunity as a jurisdictional element that may be brought forth at any time, *see Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 449 (2d Cir. 1999), Eleventh Amendment immunity "does not implicate a federal court's subject matter jurisdiction in any ordinary sense."  *ITSI TV Prods. V. Agricultural Ass'ns*, 3 F.3d 1289, 1291 (9th Cir. 1993) (advising that Eleventh Amendment immunity should be treated as an affirmative defense).  Therefore, Defendant waived its sovereign immunity arguments against Plaintiffs' 42 U.S.C. § 1981 claims because it failed to plead this affirmative defense in its Answer.  *See Westfarm Assocs. Ltd. Pshp. V. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 689-90 (4th Cir. 1995) (noting that "sovereign immunity is waived when not raised, as a matter of federal law") (citing *Bentley v. Cleveland County Bd. Of County Comm'rs*, 41 F.3d 600, 604-05 (10th Cir. 1994).

> **b.** **The Court Should Treat Defendant's Statutory Exclusion Of Punitive Damages As Waived Because This Constituted An Affirmative Defense And Defendant Waived This Affirmative Defense By Not Complying With Rule 8(c).**

In addition to waiving its Eleventh Amendment Sovereign Immunity claim, Defendant also waived its ability to use the statutory exclusion against punitive damages for Plaintiff's claims arising from 42 U.S.C. § 1981(a) and the Florida Civil Rights Act of 1992.  Both punitive damages exclusions are affirmative defenses because they do not deny liability, but merely avoid the issuance of punitive damages.  *See Royal Palm*, 716 F. Supp. at 1420; *see also Ingraham*, 808 F.2d at 1080.  Moreover, both § 1981(a) and Fla. Stat. 760.11(5) should be treated as

affirmative defenses because, as explained in *Ingraham* where the court analyzed a similar statutory cap on damages, these clauses are "avoidance[s]" under Rule 8(c)'s express language. *See Ingraham*, 808 F.2d at 1079.  Therefore, as with all affirmative defenses, Defendant's failure to plead them according to Rule 8(c) requires that this Court deems them waived.  *See id.*

Some courts have used their discretion to overlook a failure to affirmatively plead § 1981(a), which is similar to Fla. Stat. 760.11(5), because it arises from the same statute from which a plaintiff seeks relief.  *See Weber v. Infinity Broad. Corp.*, Case No.: 02-74602, 2005 U.S. Dist. LEXIS 40724, at *23 (E.D. Mich. Dec. 14, 2005).  However, this rationale is not sufficient to overlook Defendant's lack of pleading of these affirmative defenses because had Defendant complied with the requirements of Rule 8(c), Plaintiffs would have had the ability to "chart the course of litigation in advance of discovery and motions thereon" according to these specific punitive damages exclusions, and investigated other causes of action to make up for these exclusions.  *See Harris v. Secretary, U.S. Dept. of Veterans Affairs*, 126 F.3d 339, 341 (D.C. Cir. 1997); *Ingraham*, 808 F.2d at 1079 (noting that Plaintiffs would have done things differently if statutory cap had been pled in line with Rule 8(c)); *see also Jakobsen v. Massachusetts Port Authority*, 520 F.2d 810, 816, (1st Cir. 1975).  Therefore, Defendant's lack of compliance with Rule 8(c) had a real effect upon Plaintiffs' causes of actions, and thus, without deeming them as waived, the Court is permitting the Defendant to "ambush" the Plaintiff with these defenses.  *See Ingraham*, 808 F.2d at 1079.

     **c.**    **The Court Should Treat Defendant's Argument That Plaintiff John Williams Failed To Raise Racial Discrimination Claims Because This Is An Affirmative Defense That Defendant Waived By Not Pleading It In Compliance With Rule 8(c).**

Defendant's argument that John Williams failed to raise racial discrimination claims in his EEOC charge is an affirmative defense because it is not a denial of the facts, but merely acts as a means to  immunize Defendant from Plaintiff's claims on the basis of a procedural requirement.  *See Royal Palm*, 716 F. Supp. at 1420.  Rule 8(c), however, requires that

Defendant have stated this in a pleading, such as its Answer to Plaintiff's Amended Complaint. *See Harris*, 126 F.3d at 341 ("affirmative defenses must be raised in a responsive pleading, not a dispositive motion").  Defendant's Answer does not plead, even applying the liberal standard of notice pleading, this affirmative defense because the pleading does not: 1) mention the EEOC, 2) mention any indication of a deficiency or potential deficiencies in Plaintiffs' Right to Sue Letters, and 3) any insufficiencies in the substance of Plaintiffs' procedurally required documents.  In fact, the generalized statement constituting Defendant's first affirmative defense, that Plaintiffs "failed to comply with the conditions precedent to the filing of the subject lawsuit" is so vague and ambiguous, it is exactly the type of statement that Rule 12(f) is meant to strike as an insufficient affirmative defense.  *See United States v. Metro*, 61 F.R.D. 83, 85 (N.D. Ga. 1973) (statements that are so broad are "unintelligible" and should be stricken).

Moreover, the issue of whether Mr. Williams did include racial discrimination in his EEOC is a heavily factual matter.  This is significant because had Plaintiff known of this affirmative defense, it could have, and indeed would have, crafted its discovery plan with an additional focus as to addressing this heavily factual matter.  *See Harris*, 126 F.3d at 341. However, because Defendant failed to assert this affirmative defense in compliance with Rule 8(c), Plaintiff will be prejudiced if required to address this heavily factual issue without the benefit of focused discovery that compliance with Rule 8(c) would have provided.  Therefore, the Court should deem this argument as waived due to Defendant's failure to comply with Rule 8(c) and its attempt to "lie behind a log and ambush" the Plaintiffs with this heavily factual issue. *See Ingraham*, 808 F.2d at 1079.

### 6. Milton Davis exhausted his administrative remedies under Title VII.

Indeed, Milton Davis was forced to resign in 2008.  He filed his charge of race discrimination in May of 2011 because at that time he discovered strong evidence that the Defendant treated him differently than his Hispanic co-workers by tampering with his personal file and fraudulently misrepresented the so called "reason" as to his employment ended with the

College when the Defendant fraudulently wrote on a resignation letter "Dean Baez gave me an opportunity to stay after I had quit due to personal reasons...."[122]

Having found out in 2011 that his personnel file was tampered with, and further learning through his counsel's investigation that a history of this was happening to black custodians,[123] he decided to file a charge of discrimination with the EEOC.  He did not have this information until 2011,[124] and he filed his Complaint and Charge shortly after acquiring it, well within 300 days.

Here, as was the case in the Eleventh Circuit's decision of *Jones v. Dillard's, Inc.*, 331 F.3d 1259 (11th Cir. 2003) equitable estoppel applies because the employer misrepresented the reasons for his termination.  Further, this is brand new information to the Plaintiff, which allows the Court to extend the time he had to file because he could not, by the exercise of reasonable diligence, have discovered this information which is essential to his claim.[125]

Further, the Defendant has not established when this fraudulent resignation letter was written or put into his personnel file.  It may have even been within 300 days of filing his Charge.  And this material fact would therefore be in dispute, and given our summary judgment stage where any doubt must be resolved in favor of the non-moving party, and Title VII's broad

---

[122] See Exhibit 24 – Fraudulent Resignation Letter placed in Milton Davis personnel file.  Compare that to Exhibit 25 – the actual resignation letter of Milton Davis.

[123] See Exhibit 24 – Fraudulent Resignation Letter placed in Milton Davis personnel file.  Compare that to Exhibit 25 – the actual resignation letter of Milton Davis.

[123] Exhibit 10 – Declaration of Albert McDuffie; Exhibit 21 - Shedrick Deposition Pg. 73; Exhibit 13 – Affidavit of Prof. Nancy Wilson Young ¶ 12; Exhibit 19 - Davis Deposition Pgs. 40-41, 20-25.

[124] Exhibit 19 – Depo of Milton Davis 54-59.

[125] Employees filed a complaint against their employer, alleging employment discrimination based on sex in violation of Title VII, and the court in *Abassi v. Owens-Brockway Corp.*, 1996 WL 685451 (N.D. Ill. 1996) (unreported opinion), found that the employees were successful in showing that they could not, by the exercise of reasonable diligence, have discovered information essential to their claims, so that the limitations period for filing a charge with the Equal Employment Opportunity Commission (EEOC), as required by the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-5(e)(1), would be equitably tolled.  *See also Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 11 Fair Empl. Prac. Cas. (BNA) 235, 10 Empl. Prac. Dec. (CCH) ¶10358 (5th Cir. 1975), when a female employee brought a Title VII action against her former employer, alleging discrimination in employment on the basis of sex, the court determined that the limitations period for filing a charge of employment discrimination with the Equal Employment Opportunity Commission (EEOC), provided for by the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-5(e)(1), would be equitably tolled until the facts that would support a charge of discrimination were apparent to the employee or should have been apparent to a person with a reasonably prudent regard for his or her rights similarly situated to the employee. Thus, the limitations period requirement did not bar the employee's suit, held the court, as she had not learned, nor in the circumstances could reasonably have been expected to learn, facts that would support her charge of an unlawful employment practice until the limitations period had already passed.

remedial purpose, the Court should deny Defendant's request to Dismiss Milton Davis' Title VII claims.

### 7. The Court Should Deny the Defendant's Motion for Summary Judgment for Noncompliance with the Court's Order and Local Rules.

The Court should take note that Defendant's Motion for Summary Judgment is not in compliance with either the Court's September 6, 2012 Order, (Dkt. No. 74), or Local Rule 56.1. District Courts have wide discretion to determine the appropriate remedies or actions it orders with regards to non-compliance with Orders or local rules, and it is in the best interest of all parties  closely adhere to these Rules.  *See United Rentals, Inc. v. Mid-Continent Case Co.*, 843 F. Supp. 2d 1309, 1311 n. 3 (S.D. Fla. 2012); *Ocean's 11 Bar & Grill, Inc. v. Indem. Ins. Corp., RRG*, Case No.: 11-61577, 2012 U.S. Dist. LEXIS 93461, at *6-*8 (S.D. Fla. July 6, 2012)

On September 6, 2012, the Court granted Defendant the ability to file a "**single** summary judgment motion and memorandum" no longer than thirty pages long and a "**single**" Statement of Material Fact no more than twenty pages long.  (emphasis *not* added)**.**  However, Defendant fails to comply with this Order, along with Local Rule 56.1, for the following reasons. First, rather than filing a separate motion with incorporated memorandum of law that is "accompanied" by a Statement of Undisputed Material Facts, Defendant seemingly filed these two documents together in one forty-two page document.[126]  If the Defendant asserts it did not file these two documents together it has gone 12 pages over the 30 page limit the Court set. Thus, Plaintiffs ask the Court to exercise its discretion and deny the Defendant's Summary Judgment.  *See Ocean's 11*, 2012 U.S. Dist. LEXIS 93461, at *6-*8  (where court denied summary judgment for failing to comply with local rules and Court's instructions).

### 8. Conclusion and Request for Relief

WHEREFORE, for the foregoing reasons, the Court should summarily deny the Defendant's Motion for Summary Judgment and Award Plaintiffs attorneys' fees for having to

---

[126] In actuality, the length of the brief with exhibits is **92 pages**.  Furthermore, it is unclear whether the section entitled "Statement of Undisputed Facts" at page 4 is meant to be a separate Statement of Undisputed Material Facts because it is placed within the actual memorandum of law in support of Summary Judgment.

respond. As the Supreme Court pointed out in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), a plaintiff need only demonstrate by either direct or circumstantial evidence, that the employer was "motivated" to take adverse employment action for an unlawful reason.  The Plaintiffs have more than demonstrated that here.

Dated 09/28/12 in Miami, Florida

<u>/S/ *Dale J. Morgado*</u>
Dale J. Morgado, Esq.
FL Bar No. 0064015
FELDMAN, FOX & MORGADO PA
100 North Biscayne Blvd,
Suite 2902
Miami, FL 33132
PH: 305-222-7850
FX: 305-384-4676
dmorgado@ffmlawgroup.com

## CERTIFICATE OF SERVICE

I certify that on September 28, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send a notice of electronic filing to the following:

Karen A. Brimmer
FL Bar No. 236470
HINSHAW & CULBERTSON LLP
2525 Ponce de Leon Blvd., 4th Floor
Coral Gables, FL 33134
kbrimmer@hinshawlaw.com

<u>/S/ *Dale J. Morgado*</u>
Dale J. Morgado, Esq.