### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 11-21457-CIV-ROSENBAUM/SELTZER

SHACK SHEDRICK, *et al.*,

      Plaintiffs,

v.

DISTRICT BOARD OF TRUSTEES OF
MIAMI-DADE COLLEGE,

      Defendant.

_____/

### <u>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

This matter is before the Court on Defendant's Motion for Summary Judgment [D.E. 75]. The Court has reviewed Defendant's Motion, the opposing and supporting briefs, and the evidence on the record and is otherwise fully advised in the premises.  For the reasons set forth below, the Court grants in part and denies in part Defendant's Motion.

Plaintiffs Shack Shedrick, John Williams, Milton Davis, and Jerome Mitchell were all custodial employees on the Kendall campus of Defendant Miami-Dade College ("MDC").  Plaintiffs have filed a Complaint alleging that MDC discriminated against them on the basis of race, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and the Florida Civil Rights Act ("FCRA"), Fla. Stat. 760.01, *et seq.* (Counts I and IV); discriminated and retaliated against them in violation of 42 U.S.C. § 1981 (Count III); and retaliated against them in violation of Title VII and the FCRA (Counts II and V).  D.E. 7.  Defendant has moved for summary judgment on procedural and substantive grounds.  The Court addresses each argument below.

# I. MATERIAL FACTS[1]

## A. Employment Conditions at Defendant's Kendall Campus

Many administrative officials at MDC have used racially derogatory slurs generally and with respect to individual Plaintiffs. For example, Tina Wood, Director of Campus Services, described Plaintiff Shedrick using a derogatory term for African-Americans and also used the same term to generally lament that African-Americans were hampering the operations of MDC's Kendall campus. D.E. 85, Additional Facts, ¶ 1. Omaira Gil, Head Custodian, using similar derogatory language, reportedly stated that African Americans are "lazy" and that she could not "wait to keep on bringing Hispanics." *Id.*

Additionally, Miguel Ramirez, who served as Director of Custodial Services from June 2010 to June 2011, has testified that Dean of Administration Gloria Baez, Wood, and Gil told Ramirez to get rid of black custodians. *Id.* ¶ 2; D.E. 84-28. Ramirez further states that black custodians would be fired for cause when such cause did not exist. D.E. 84-28. Ramirez also asserts that he was told to put his name on false disciplinary reports by MDC management. *Id.*

Dean Baez could make recommendations to MDC's Human Resources Department regarding employment decisions and those recommendations were always followed. D.E. 85, Additional Facts, ¶ 5. Baez also stated at one point that she planned to fire older black custodians and that black custodians were lazy. *Id.* ¶ 7.

## B.  John Williams

Williams is a black male who worked as a part-time custodian at MDC. D.E. 75, Williams,

---

[1] The following facts are taken from the parties' respective statements of undisputed material facts, D.E. 75 and D.E. 85. Plaintiffs have not contested many of Defendant's facts, and Defendant, other than stating generally that they are not probative, has not contested any of the additional facts submitted by Plaintiffs. Accordingly, those uncontested facts are deemed admitted by the respective parties. *See* L.R. 56.1(b), S.D. Fla.

¶ 2.  In late 2009 or early 2010, Williams began to suffer an illness that required hospitalization.  *Id.* ¶¶ 7; D.E. 76-4 at 78:12-86:2.[2]  Williams requested a thirty-day medical leave on January 11, 2010. D.E. 75, Williams, ¶ 7.  When Williams did not return to work after thirty days, MDC sent him a letter on February 18, 2010, terminating his employment.  *Id.*  Prior to becoming ill, Williams did not inform MDC of any disability.  *Id.* ¶ 5.

On April 5, 2010, Williams filed a charge with the EEOC alleging that he was discharged on the basis of disability in violation of the Americans with Disabilities Act.  *Id.* ¶ 1

**C. Milton Davis**

Davis is an African-American male who worked as a part-time custodian at MDC.  D.E. 75, Davis, ¶ 1.  In late 2007 or early 2008, Davis requested permission to come in late to work twice per week so that he could attend a class.  *Id.* ¶ 2.  Dean Baez denied Davis's request and told Davis that he would have to resign if wanted to take the class.  *Id.*; D.E. 85, Davis, ¶2.  Davis resigned on February 15, 2008.  D.E. 75, Davis, ¶ 1.

At the time that Davis requested an accommodation to his schedule to take a class, he believed that Hispanic custodians had been permitted to take classes on the clock or to come in late to work because of classes.  *Id.* ¶ 4; D.E. 85, Davis, ¶ 4.  Davis filed an EEOC charge alleging that his resignation was a constructive discharge.  D.E. 75-11.  Davis did not file his EEOC charge until May 2011, more than three years after his employment with MDC ended.  *Id.*; D.E. 75, Davis, ¶ 3.

**D. Shack Shedrick**

Plaintiff Shedrick is an African-American male who was previously employed by Defendant as a full-time custodian.  D.E. 75, Shedrick, ¶ 1.  Shedrick resigned from his employment on January

---

[2] The depositions in this case have two distinct page numbers, the original page number and the page number added by the Court's CM/ECF system.  All references to depositions in this Order use the depositions' original page numbers.

23, 2009, after being given a choice of resignation or termination by Defendant. *Id.*

Shedrick's employment record reflects both commendations and reprimands. *Id.* ¶ 4; D.E 85, Shedrick, ¶ 13. In 1995, Shedrick received a verbal warning after having a physical altercation with an MDC student. D.E. 75, Shedrick, ¶7. In 2003, Shedrick was reprimanded and suspended by Donell Ruffin for leaving work early without authorization. *Id.* ¶ 4. In a June 2008 incident, Shedrick was reprimanded and suspended for insubordination after getting into an argument with Assistant Director of Custodial Services Eduardo Padilla over a set of keys and custodial assignments. *Id.* ¶ 6. Although Shedrick contests that he was in the wrong regarding the keys, he does not dispute that he argued with a superior about the keys and the assignments. *Id.*; D.E. 85, Shedrick, ¶ 6.

In August 2008, Shedrick was placed on probation for thirty days by Director of Custodian Services Mark Mills after MDC could not contact him regarding preparing the campus for Tropical Storm Fay. D.E. 75, Shedrick, ¶ 8. Shedrick asserts that another black custodian also could not be reached by Defendant but was not disciplined in any way. *Id.*

In addition to these incidents, Shedrick submitted a complaint to Defendant about being forced to work at night without air conditioning and without proper ventilation. *Id.* ¶ 5. Upon receipt of a letter from Shedrick's physician, Associate Vice Provost of Human Resources Bettie Thompson requested that Shedrick complete and return an Authorization for Release of Medical Records. *Id.* Shedrick never returned the forms, and as a result, Defendant deemed the matter closed. *Id.*

At some point, four non-black custodians were reprimanded by a supervisory custodian, Roy Augustus. *Id.* ¶ 9. Although Shedrick believed that Padilla ordered Augustus to remove the four reprimands from those employees' personnel files, Augustus says this did not occur. *Id.*; D.E. 76-5

4

at 26:1-28:18.  However, Padilla did tell Augustus to "forgive" the four custodians.  D.E. 76-5 at 26:17-27:14.

On December 19, 2008, Shedrick called in sick to work on a day when all of MDC's custodial staff were required to report to work to prepare the school for the winter break.  D.E. 75, Shedrick, ¶ 10.  Despite calling in sick, however, Shedrick came to the campus to pick up and cash his paycheck, use the MDC computer system to submit a sick-leave form, and attend a campus holiday party during the regularly scheduled hours of his shift.  *Id.*  Shedrick was observed by one of his supervisors, Tina Wood, at the holiday party.  *Id.*  In January 2009, MDC gave Shedrick the option of resigning or being terminated, and Shedrick resigned.  *Id.*

### E.  Jerome Mitchell

Mitchell, a black male, was hired by MDC as a part-time custodian in 1999.  D.E. 75, Mitchell, ¶ 1.  In July 2001, Mitchell was promoted to a full-time warehouse manager with a commensurate increase in pay.  *Id.*  In 2005, Baez and Clive Bridges, a Human Resources employee, informed Mitchell that his salary was the equivalent of a head custodian's salary and that he would need to perform the duties of a head custodian, including supervising employees; Mitchell declined to accept those duties.  *Id.*  In 2006, Baez again approached Mitchell and stated that he needed to perform supervisory functions in order to continue earning supervisor-level pay.  *Id.* ¶ 2.  When Mitchell declined to accept these responsibilities, his pay was cut, and he was placed in the role of full-time custodian.  *Id.*

On March 9, 2007, Mitchell injured his feet on the job and, after being treated by a campus physician, was permitted to return to work to perform "sit down only" duty.  *Id.* ¶ 3.  The next day, Mitchell was asked by Gil, his supervisor, to sign in at his new duty location.  *Id.*; D.E. 85, Mitchell, ¶ 3.  The parties dispute whether there was any place for Mitchell to actually sign in, but, in any

event Mitchell did not sign in anywhere.  D.E. 75, Mitchell, ¶ 3;  D.E. 85, Mitchell, ¶ 3.  Mitchell

then left work, although it is disputed whether he did so on his own or at the direction of Gil.  D.E.

75, Mitchell, ¶ 3;  D.E. 85, Mitchell, ¶ 3.  On March 20, 2007, Mills issued a written reprimand to

Mitchell stating that Mitchell impermissibly left work without explanation.  D.E. 75, Mitchell, ¶ 3.

Mitchell was placed on sixty-day probation in February 2009 because he had missed 60 out

of 267 days of work between January 22, 2008, and February 16, 2009.  *Id.* ¶ 7.  On April 13, 2009,

Mitchell filed an EEOC charge alleging discrimination on the basis of race and disability.  *Id.* ¶ 4;

D.E. 75-24.  On May 26, 2009, Mitchell was notified by Iliana Castillo-Frick, the Vice Provost of

Human Resources, that his position had been eliminated as part of a college-wide reduction-in-force.

D.E. 75, Mitchell, ¶ 7.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(C).  An issue is genuine if "a

reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of*

*Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the

suit under the governing law."  *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

On a motion for summary judgment, the Court views the evidence, including all reasonable

inferences drawn from it, in the light most favorable to the non-moving party and resolves all

reasonable doubts against the movant.  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir.

2008); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009).  The Court does not

weigh conflicting evidence.  *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and*

*reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007).  Nor does the Court determine the credibility of witnesses.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citation omitted).  Upon discovering a genuine material dispute, the Court must deny summary judgment and proceed to trial.  *Id.* at 1292.

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'"  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343.

Local Rule 56.1, S.D. Fla., further factors into this Court's consideration of a motion for summary judgment.  Under Local Rule 56.1, a party moving or opposing summary judgment must submit a "statement of the material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively."  S.D. Fla. L.R. 56.1(a).  The rules require these statements be supported by "specific references" to evidence on the record.  S.D. Fla. L.R. 56.1(a)(2).  The Local Rules expressly caution, "All material facts set forth in the movant's statement filed and supported as required above will be *deemed admitted* unless controverted by the opposing party's statement, provided that the Court finds that the movant's

statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b) (emphasis added). But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that the evidence on the record supports the uncontroverted material facts that the movant has proposed. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

## III. ANALYSIS

### A. Eleventh Amendment Immunity

Defendant argues that it is entitled to summary judgment on Count III of Plaintiff's Complaint because, as an arm of the state of Florida, it is protected from any suit under 42 U.S.C. § 1981[3] by Eleventh Amendment immunity. D.E. 75 at 15-16. Plaintiffs do not attack the substance of Defendant's Eleventh Amendment argument but, instead, assert that Defendant has waived any Eleventh Amendment defense because it did not raise the defense in its answer. D.E. 84 at 23-24.

The Eleventh Amendment to the United States Constitution bars lawsuits against a state in federal court without the consent of the state. *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003). This protection extends to entities acting as an "arm of the state." *Id.* Determining whether an entity is an "arm of the state" requires an individualized inquiry into the "particular function" of the entity. *Id.* With regard to community colleges in Florida, the Eleventh Circuit has determined that a

---

[3] At the outset, the Court notes that because Defendant is a state actor, Plaintiffs have no cause of action under § 1981 itself. *Butts v. Cnty. of Volusia*, 222 F.3d 891, 894-95 (11th Cir. 2000). Rather, violations of § 1981 must be brought under 42 U.S.C. § 1983. *Id.*; *see id.* at 892 n.1. While Plaintiffs allege violations of § 1981, nowhere in Plaintiffs' Amended Complaint do they mention § 1983. *See* D.E. 7. However, Defendant has not raised this point in its motion. Because the Court finds Eleventh Amendment immunity protects Defendant in any case, the Court need not address the question of whether Plaintiffs have properly brought their cause of action for violations of § 1981 under § 1983.

community college "is an arm of the state for purposes of immunity under the Eleventh Amendment." *Williams v. Dist. Bd. of Trs. of Edison Cmny. Coll., Fla.*, 421 F.3d 1190, 1192-95 (11th Cir. 2005). The Eleventh Circuit's analysis in *Williams* applies with equal force to Defendant here, a Florida community college under the Florida K-20 Educational Code, Fla. Stat. § 1000.01, *et seq*. Accordingly, Defendant is entitled to Eleventh Amendment immunity unless that immunity has been waived.

Although courts often speak of Eleventh Amendment immunity in jurisdictional terms, *see Doe v. Moore*, 410 F.3d 1337, 1349 (11th Cir. 2005), the protection is not absolute and may be waived by a state. The inquiry into whether a state has waived its immunity, however, is stringent. *Barnes v. Zaccari*, 669 F.3d 1295, 1308 (11th Cir. 2012) (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999); *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)). A waiver must specifically permit suits against the state in federal court. *Id.* (citing *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306 (1990)). Generally, waiver is found only when the state voluntarily invokes the jurisdiction of a federal court or the state "makes a 'clear declaration' that it intends to submit itself" to federal jurisdiction. *Id.* (quoting *Fla. Prepaid*, 527 U.S. at 675-76).

Plaintiffs point to no clear declaration of waiver by Florida, and, in fact, Florida has expressly retained its immunity from suit in federal court. *See* Fla. Stat. § 768.28(18). Plaintiffs, instead, argue that Defendant has waived immunity by failing to plead it as an affirmative defense in its answer. *See* D.E. 84 at 24. For a variety of reasons, Plaintiffs' argument is unavailing.

First, and foremost, the failure to plead Eleventh Amendment immunity cannot plausibly be held to be a clear declaration of, or to even raise an overwhelming implication of, waiver, particularly in light of Florida's express retention of Eleventh Amendment immunity. *Cf. Edelman*

9

*v. Jordan*, 415 U.S. 651, 673 (1974) ("[W]e will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.'" (citation omitted)). Second, the fact that Defendant has raised the defense for the first time in its summary-judgment motion is of no moment, as the Supreme Court has expressly noted that Eleventh Amendment immunity "deprives federal courts of any jurisdiction to entertain such claims, and thus may be raised at any point in a proceeding." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 n.8 (1984); *see Doe v. Moore*, 410 F.3d 1337, 1349 (11th Cir. 2005) ("Eleventh Amendment jurisdictional questions can be raised for the first time on appeal . . . .").

Finally, each of the cases Plaintiffs cite in support of their proposition is distinguishable. While in *ITSI T.V. Productions, Inc. v. Agricultural Ass'ns*, 3 F.3d 1289, 1291 (9th Cir. 1993), the Ninth Circuit did note that "Eleventh Amendment immunity, whatever its jurisdictional attributes, should be treated as an affirmative defense," *id.*, that court did not address the timing of an Eleventh Amendment defense. Rather, the Ninth Circuit considered only the question of who had the burden of proof and concluded that, just as the burden rests with a party raising an affirmative defense, in the case of the Eleventh Amendment, the burden of proof rests with the party invoking immunity. *Id.* In fact, although the Ninth Circuit likened Eleventh Amendment immunity to affirmative defenses in the context of evidentiary burdens, the court noted that a sovereign-immunity defense may be raised for the first time on appeal. *Id.* (citing *Edelman*, 415 U.S. at 678).

Plaintiffs also point to *Westfarm Associates Ltd. Partnership v. Washington Suburban Sanitary Commission*, 66 F.3d 669, 689-90 (4th Cir. 1995), which, in *dicta*, construed a Tenth Circuit decision as holding that "sovereign immunity is waived when not raised, as a matter of federal law." *Id.* at 690. That Tenth Circuit case, however, held that a statutory damages cap is not

an issue of sovereign immunity, but a statutory limit on liability. *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994). The Tenth Circuit further stated, "Moreover, this Court has long held that both qualified and absolute immunity are affirmative defenses that must be pleaded." *Id.* Although the Fourth Circuit's reading of *Bentley* is not implausible, this Court reads the Tenth Circuit's opinion, in light of the Supreme Court's admonition that Eleventh Amendment immunity may be raised at any point in the proceedings, to mean that statutory limits on liability are more akin to defenses of absolute or qualified immunity that must be raised in the pleadings than to the defense of Eleventh Amendment immunity. In any event, the Tenth Circuit's opinion is not binding on this Court, and in light of the Supreme Court and Eleventh Circuit cases holding that Eleventh Amendment immunity can be raised at any point in the proceedings, the Court finds that Defendant has not waived it immunity by failing to plead it in its answer. Accordingly, Defendant is entitled to summary judgment on Count III of Plaintiffs' First Amended Complaint.

**B. Punitive Damages**

Defendant also moves for summary judgment on Plaintiffs' claims for punitive damages based on the fact that, because Defendant is a state governmental entity, Plaintiffs are not entitled to collect punitive damages under either Title VII or the FCRA. D.E. 75 at 16-17. In response, Plaintiffs do not assert that the statutory prohibitions are inapplicable to Defendant. Instead, Plaintiffs suggest that non-entitlement to punitive damages is an affirmative defense that must be pled or is otherwise waived. D.E. 84 at 24-25. The Court is unpersuaded by Plaintiffs' arguments.

In 1991, Congress amended the Civil Rights Act to permit plaintiffs to recover previously unrecoverable compensatory and punitive damages in civil rights lawsuits, but at the same time, explicitly prohibited recovery of punitive damages from "a government, government agency or political subdivision." 42 U.S.C. § 1981a(b)(1); *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526,

533-34 (1999) ("The very structure of § 1981a suggests a congressional intent to authorize punitive awards in only a subset of cases involving intentional discrimination.").  Similarly, in the section of the FCRA authorizing punitive damages awards, the Florida legislature provided, "Notwithstanding the above, the state and its agencies and subdivisions shall not be liable for punitive damages."  Fla. Stat. § 760.11; *see Klonis v. Fla. Dep't of Revenue*, 766 So. 2d 1186, 1190 (Fla. 1st DCA 2000); *see also* Fla. Stat. § 768.28(5) (providing that the state, its agencies, and subdivisions shall not be liable for punitive damages in tort actions).  From the face of these statutes, then, punitive damages are clearly not authorized against state agencies.

That punitive damages against a governmental entity are completely barred is further confirmed by an unpublished opinion from the Fifth Circuit.  *See Liner v. Hosp. Serv. Dist. No. 1 of Jefferson Parish*, 230 F. App'x 361 (5th Cir. 2007).  In *Liner*, the plaintiff appealed a post-judgment order striking an award of punitive damages.  Like Plaintiffs here, Liner did not contest that punitive damages were unavailable against governmental entities under § 1981a, but rather argued that the governmental defendant waived the issue by not presenting it until after the jury returned a verdict.  *Id.* at 365.  The Fifth Circuit held that even if the defendant had failed to preserve the issue by not raising it at trial, imposing punitive damages on a governmental defendant is "plainly erroneous" under § 1981a and affirmed striking of the punitive damages award.  *Id.* at 365-66 (citing *Oden v. Oktibbeha Cnty.*, 246 F.3d 458 (5th Cir. 2001)).

Although Plaintiffs liken the prohibition on punitive damages to a statutory damages cap, which courts have held is an affirmative defense that must be pled, the Court does not agree. Plaintiffs rely primarily on the Fifth Circuit case of *Ingraham v. United States*, 808 F.2d 1075 (5th Cir. 1987), which held that a Texas cap on medical malpractice damages was an affirmative defense. However, the circumstances of *Ingraham* are significantly different than those in this case.

12

First, statutory damages caps are fundamentally different from an outright bar on punitive damages. In *Ingraham*, the Fifth Circuit found that the cap represented an "avoidance" defense, as that term is used in Federal Rule of Procedure 8(c), because while "admitting the facts alleged in the former pleading, [it] shows cause why they should not have their ordinary legal effect." *Id.* at 1079. The plaintiffs in *Ingraham*, however, presented a "traditional tort theory of malpractice and [sought] full damages." *Id.* The damages cap thus was an affirmative defense because it reduced the traditional entitlement to full damages. Here, Plaintiffs pursue a statutory cause of action that traditionally offered no punitive damages against any defendants and subsequently allowed them only against non-governmental defendants. *See Kolstad*, 527 U.S. at 533-34. In the language of *Ingraham*, there is no set of facts that can be alleged and admitted that would have the "ordinary legal effect" of imposing punitive liability on Defendant. Thus, the prohibition on punitive damages is not akin to a statutory damages cap.[4]

Second, the defendants in *Ingraham* did not seek to invoke the damages cap until after trial and after a judgment was entered. *Id.* at 1077-78. In these circumstances, the Fifth Circuit concluded that applying the damages cap would amount to "unfair surprise" because the plaintiffs could have attempted to more vigorously prove damages exempt from the cap or introduce evidence supporting their constitutional claim. *Id.* at 1079. Here, the punitive damages prohibition is being

---

[4] In fact, the Court has found only a single, unpublished opinion where a court concluded that § 1981a(b)(1) was not a complete bar to punitive damages against governmental defendants but rather an affirmative defense. *See Mehringer v. Vill. of Bloomingdale*, No. 00 C 7095, 2003 WL 21506856 (N.D. Ill. June 27, 2003). The *Mehringer* Court, however, relied on cases construing local government immunity from punitive damages in § 1983 actions that did not discuss the Title VII statutory prohibitions found in § 1981a. *Id.* at *7-*8 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981); *Chestnut v. City of Lowell*, 305 F.3d 18 (1st Cir. 2002); *Kolar v. Cnty. of Sangamon*, 756 F.2d 564 (7th Cir. 1985)). To the extent the *Mehringer* Court found the § 1983 framework indistinguishable from Title VII, this Court respectfully disagrees. *See Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) (noting the distinct recovery frameworks available under § 1983 and Title VII, even after the 1991 amendments to Title VII).

raised for the first time in a summary-judgment motion.  While Plaintiffs maintain that they, too, are victims of unfair surprise, they do not offer any specific consequences for this alleged surprise. Rather, they conclusorily state that had they been aware of their non-entitlement to punitive damages, they would have "had the ability to chart the course of litigation in advance of discovery and motions thereon according to these specific punitive damages exclusions, and investigated other causes of action to make up for these exclusions."  D.E. 84 at 25.  But unlike in *Ingraham*, where there were exceptions to the cap that could have been pursued, there are no discernible exceptions to the prohibition against imposing punitive damages on state defendants.  Further, to the extent Plaintiffs say they could have pleaded other claims to "make up" for the unavailability of punitive damages, Plaintiffs have not offered any inkling as to what those claims might be.  The Court is unwilling to engage in speculation on behalf of Plaintiffs in order to support a finding of "unfair surprise," especially when Plaintiffs should have known from the start that the statutes under which they were bringing their claims expressly forbid recovery of punitive damages.[5]

Regarding the FCRA specifically, the parties have cited no authority addressing the issue of whether the FCRA's prohibition on punitive damages against state entities must be pled as an

---

[5] Interestingly, the Fifth Circuit distinguished its holding in *Ingraham* from another case, *Lucas v. United States*, 807 F.2d 414 (5th Cir. 1986), in which that court affirmed the decision of the district court to allow a defendant to amend its affirmative defenses at trial.  *Ingraham*, 808 F.2d at 1079.  This holding is in line with other cases where amendments of affirmative defenses at stages much later than a summary-judgment motion were found permissible.  *See Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 345 (D.C. Cir. 1997) (requiring affirmative defenses to be pled before being raised in a dispositive motion, but permitting the defendant to seek leave to amend on remand); *Mehringer*, 2003 WL 21506856, at *9-*10.  Thus, even if this Court found the prohibition on punitive damages to be an affirmative defense, because Plaintiffs have not demonstrated undue prejudice or unfair surprise, the Court would permit Defendant to amend its answer to include the defense.

affirmative defense, and the Court has found none.[6]  Given the similarities of the § 1981a and FCRA schemes, the Court finds the § 1981a analysis above analogous to the FCRA.  Accordingly, for the foregoing reasons, the Court finds that § 1981a and the FCRA present a complete bar to recovery of punitive damages and are not affirmative defenses that must be pled.  Accordingly, Defendant is entitled to summary judgment on Plaintiffs' claims for punitive damages.

**C. Williams's Title VII and FCRA Claims and Scope of His EEOC Charge**

*1.  Williams's EEOC Charge and Conditions Precedent*

Defendant seeks summary judgment on Plaintiff Williams's discrimination and retaliation claims because in the EEOC charge that Williams filed, he raised only an allegation of discriminatory discharge based on disability.  D.E. 75 at 17-18.  In response, Plaintiffs contend that Defendant waived this argument by not raising it, with particularity, in an affirmative defense and that, in any event, "the issue of whether Mr. Williams did include racial discrimination in his EEOC [*sic*] is a heavily factual matter."  D.E. 84 at 26.  Defendant counters that its general affirmative defense that "Plaintiffs have failed to comply with the conditions precedent to the filing of the subject lawsuit, and as such, their claims are barred," is sufficient to preserve their defense.  D.E. 88 at 7; D.E. 13 at 16.

Ordinarily, Title VII and the FCRA[7] require a plaintiff to file an administrative charge of

---

[6] The Court has found one opinion from the Middle District of Florida, involving an FCRA claim against a private defendant, where the Court, on the plaintiff's motion, struck an affirmative defense invoking the FCRA's cap on punitive damages for private actors.  *Adams v. JP Morgan Chase Bank, N.A.*, 2011 WL 2938467, at *5 (M.D. Fla. July 21, 2011).  The plaintiff contended that the cap was not a defense but simply a "statement of the law."  *Id.*  Although the court did not analyze the issue because the defendant agreed to withdraw the defense, the parties' agreement, at least marginally, supports the idea that caps (or prohibitions) on punitive damages under the FCRA are not affirmative defenses.

[7] Because the FCRA was patterned after Title VII, it is interpreted in accordance with those decisions construing Title VII, and thus a separate analysis of FCRA claims in a Title VII action is

discrimination prior to pursing a civil action in federal court. *See Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1225 (11th Cir. 2000). The scope of an EEOC complaint is not to be "strictly interpreted," and a plaintiff's complaint may encompass allegations of discrimination or retaliation that "can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (quoting *Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000)).

The charge of discrimination filed by Williams with the EEOC alleges only discrimination based on disability. *See* D.E. 75-13. Williams checked only the box labeled "Disability," and in the "Particulars" section, described only his belief that he was discharged because of his medical condition. *Id.* At no place does Williams mention race or ethnicity as a factor in his termination, nor does Williams contend that he was discharged in retaliation for any protected activity. *See id.*

In this action, Williams lists four causes of action[8]: Discrimination on the basis of race in violation of Title VII, D.E. 7, ¶¶ 144-157 (Count I); retaliation for complaining about racial discrimination in violation of Title VII, *id.* ¶¶ 158-163 (Count II); discrimination on the basis of race and color under the FCRA, *id.* ¶¶ 178-183 (Count IV); and retaliation because Plaintiffs "opposed the unlawful discriminatory employment practices," *id.* ¶¶ 184-186 (Count V). The first three causes of action are clearly based on race, a claim not in any way hinted at in Williams's EEOC charge. Accordingly, as a matter of law, the Court concludes that a reasonable investigation based on the EEOC charge would not encompass race-based discrimination or retaliation claims.[9] *See Chanda*,

---

not required. *See Thomas v. Miami Dade Pub. Health Trust*, 369 F. App'x 19, 21 n.2 (11th Cir. 2010) (citing *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004)).

[8] As explained above, Williams's fifth claim, his § 1981 action, is barred by the Eleventh Amendment.

[9] Plaintiff contends that whether Williams included race-based discrimination in EEOC charge is a "heavily factual matter." However, Plaintiffs have cited no authority for this proposition

16

234 F.3d at 1225.

Williams's retaliation claim under the FCRA is a different matter, however.  Unlike the earlier counts, Count V does not expressly mention race discrimination, or complaints about race discrimination, as the basis for the FCRA retaliation claim.  Rather, Count V mentions only opposition to "unlawful discriminatory employment practices." D.E. 7, ¶ 185.  The Eleventh Circuit has previously held that retaliation claims can reasonably grow out of an EEOC charge levying discriminatory discharge claims if the facts of the EEOC charge are inextricably intertwined with the facts of the discharge.  *See Gregory*, 355 F.3d at 1280.  And unlike Title VII, the FCRA also encompasses discrimination based on disability.  *See* Fla. Stat. § 760.10.  Thus, Williams's failure to include retaliation in his EEOC charge alleging disability discrimination does not preclude an FCRA claim alleging retaliation for activity "inextricably intertwined" with Williams's disability-based EEOC charge.  Accordingly, summary judgment for Defendant would be inappropriate on Count V as it applies to Williams based on a conditions-precedent argument.[10]

*2. Waiver of Conditions Precedent Defense*

As noted above, Plaintiffs maintain that Defendant is not entitled to summary judgment on any of Williams's counts based on his limited EEOC charge because Defendant waived that defense by not raising it with sufficient specificity in its Answer.  D.E. 84 at 26.  Defendant retorts, however, that its first affirmative defense—asserting that Plaintiffs failed to comply with the conditions precedent to the filing of their lawsuit—is sufficient to maintain the defense.  D.E. 88 at 7.

---

nor even suggested what facts would give rise to a race-based claim from the plainly disability-focused EEOC charge.  Plaintiffs' bald assertion that this is a "heavily factual matter" is insufficient to create a genuine issue of material fact.  *See Bryant v. U.S. Steel Corp.*, 428 F. App'x 895, 897 (11th Cir. 2011) (citing *Anderson*, 477 U.S. at 249-50) ("[T]he non-moving party cannot create a genuine issue of material fact through speculation [or] conjecture . . . .").

[10] The merits of Williams's FCRA retaliation claim are addressed below.

Defendant's Answer also contained a general denial, based on its lack of knowledge, of the paragraph in Plaintiffs' First Amended Complaint alleging that conditions precedent had been fulfilled.  D.E. 13, ¶ 5.

In this Circuit, the procedural preconditions to filing a Title VII lawsuit are viewed as conditions precedent, and compliance with such conditions precedent must be pled generally by a plaintiff in the complaint.  *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1009-10 (11th Cir. 1982).  Rule 9(c), Fed. R. Civ. P., provides that while a party may generally allege that conditions precedent have been satisfied, a party denying that a condition precedent has been performed "must do so with particularity."  Fed. R. Civ. P. 9(c).  Although Rule 9(c) requires a denial instead of an affirmative defense, technical noncompliance with this pleading requirement is excused in the context where the pleading is otherwise sufficient.  *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1224-25 (11th Cir. 2010).  However, neither Defendant's general denial nor its generic affirmative defense—both of which fail to discuss particular Plaintiffs, allegations, or conditions precedent—is sufficiently particular to meet the requirements of Rule 9(c).  *See Myers*, 592 F.3d at 1223-24; *Jackson*, 678 F.2d at 1010.

If the Court's inquiry ended with Defendant's Answer, therefore, Defendant would have waived its conditions-precedent defense by failing to meet the particularity standard of Rule 9(c).  Eleventh Circuit precedent, however, allows for a "specific denial of performance of conditions precedent [to] be raised by motion as well as by answer."  *Associated Mech. Contractors, Inc. v. Martin K. Eby Constr. Co.*, 271 F.3d 1309, 1317 (11th Cir. 2001) (citing *EEOC v. Klingler Elec. Corp.*, 636 F.2d 104, 107 (5th Cir. 1981) (finding a specific denial of conditions precedent raised for the first time in a fourth motion for summary judgment to be acceptable); *but see EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 332-33 (5th Cir. 2012) (criticizing the Eleventh Circuit's interpretation

of and reliance on *Klingler* for the proposition that a denial of conditions precedent may be raised in any type of motion).

Thus, at least within this Circuit, Defendant was permitted to raise its attack on whether Williams fulfilled the conditions precedent to bringing his lawsuit in its summary-judgment motion and thus could not have waived the defense by not properly raising it in its Answer. Accordingly, for the reasons discussed above, Defendant is entitled to summary judgment on Counts I, II, and IV with respect to Plaintiff Williams.

### 3. Merits of Williams's FCRA Retaliation Claim

While Defendant is not entitled to summary judgment on Williams's FCRA retaliation claim based on a conditions-precedent argument, Defendant is entitled to summary judgment on the merits of Williams's FCRA retaliation claim. As noted above, any FCRA retaliation claims must be "inextricably intertwined" with Williams's disability discrimination EEOC charge.

To prevail on an FCRA retaliation claim, a plaintiff must demonstrate that "(1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 & n.4 (11th Cir. 2010). Protected activity includes opposing unlawful employment practices or participating in any inquiry regarding an unlawful employment practice, including filing an EEOC charge. *Id.*

However, there is no evidence on the record that Williams engaged in any disability-related protected activity prior to his termination. Similarly, Williams did not file his EEOC charge until after he was discharged. *See* D.E. 75-13; D.E. 75-20. Accordingly, there can be no causal link between Williams's filing of the EEOC charge and Williams's termination. For these reasons, Defendant is entitled to summary judgment on Williams's FCRA retaliation claim.

**D. Timeliness of Davis's EEOC Charge**

Defendant moves for summary judgment against Davis on the basis that his EEOC charge was filed in May 2011, more than three years after his February 15, 2008, resignation from MDC. D.E. 75 at 29-30.  Plaintiffs do not dispute the date of filing but contend that the administrative filing period should be equitably tolled because he did not learn until 2011 that "Defendant treated him differently than his Hispanic co-workers by tampering with his personal [*sic*] file and fraudulently misrepresented the so called 'reason' as to his employment end[ing]."   D.E. 84 at 26-27. Specifically, Plaintiffs allege that someone replaced Davis's original resignation letter with an allegedly fraudulent letter that misstates the circumstances of Davis's resignation.  *Id.*

To maintain a Title VII or FCRA action, a plaintiff must have filed a charge with the EEOC within 300 days of the last discriminatory act (365 days in the case of the FCRA).  *See EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002); *see also* 42 U.S.C. § 2000e-5(1); Fla. Stat. § 760.11(1).  But the running of this period may be tolled "until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his or her rights."  *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1265 (11th Cir. 2003) (quoting *Reeb v. Econ. Opportunity Atlanta, Inc.*, 516 F.2d 924, 930 (5th Cir. 1975)); *see also Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435 (11th Cir. 1998) (finding that timing requirements might be equitably tolled if the plaintiff "had no reason to believe he was a victim of unlawful discrimination").

Here, Davis maintains that the 300-day period should be tolled because he did not learn about the allegedly fraudulent resignation letter until 2011.  D.E. 84 at 26-27.  Davis's focus on the letter is misplaced, however.  The last discriminatory act was Davis's allegedly constructive termination

on February 15, 2008.[11]  Davis claims he was forced to resign because Defendant would not permit

him to take a class that would have required him to arrive at work late twice per week.  D.E. 76-3

at 26:16-37:3, 66:20-68:14.  At the time Davis requested the accommodation to take his class, he

believed that Hispanic custodians had been allowed to take classes on the clock and to come into

work late.  *Id.* at 64:7-66:19; D.E. 75-11.  Therefore, Davis was aware, or should have been aware,

at the time he made his request and then resigned that he was apparently being treated differently

than his Hispanic colleagues.  Under these circumstances, a person with a reasonably prudent regard

for his rights would have been aware of discriminatory treatment and could have filed a charge with

the EEOC within 300 days.  *See Jones*, 331 F.3d at 1265.  Because Davis did not do so, he has not

exhausted his administrative remedies under the statute, and Defendant is entitled to summary

judgment on Davis's claims under Title VII and the FCRA.

### E.  Shedrick's and Mitchell's Discrimination and Retaliation Claims

A plaintiff may prove a claim of intentional discrimination under Title VII through direct

---

[11] Plaintiffs also appear to suggest that the placing of the fraudulent letter itself was a discriminatory act because it misrepresents the reasons for Davis's termination, and, because it is unknown when the "fraudulent" letter was placed, there is a genuine dispute of material fact concerning whether the May 2011 EEOC charge was timely.  *See* D.E. 84 at 27.  However, the Court cannot discern how the allegedly fraudulent letter amounts to discrimination.  At the outset, the Court notes that there are actually three different resignation letters on the record.  *See* D.E. 75-10; D.E. 84-24; D.E. 84-25.  The allegedly fraudulent letter is the one represented in Docket Entry 84-24, and states the reason for Davis's resignation as "Dean Baez gave me an opportunity to stay after I had quit due to personal reasons, I will return within 30 days from today."  D.E. 84-24.  The other two letters give the reason for Davis's resignation as "take class," D.E. 75-10, or "to attend class," D.E. 84-25.  The fraudulent letter gives a last-day-of-service date of January 15, 2008, and an effective date of February 15, 2008.  D.E. 84-24.  The other two letters give identical effective and last-day dates of either February 15, 2008, in D.E. 75-10, or January 15, 2008, in D.E. 84-25.

In each letter Davis resigns his position, a resignation that Davis contends was a discriminatory constructive discharge.  Whether Davis or someone else wrote that Baez gave him an opportunity to stay is not probative of whether the resignation was voluntary or coerced.  And with regard to the alleged swapping of the letters, the Court can find no adverse impact suffered by Davis from the different letters themselves.

evidence, through circumstantial evidence, or through statistical proof." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation omitted); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500-01 (11th Cir. 1991). Direct evidence is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (citations and internal quotation marks omitted). An employer's discriminatory intent can be shown with circumstantial evidence through either the *McDonnell Douglas* burden-shifting framework or by producing enough circumstantial evidence to raise a reasonable inference of, and thus triable issue of, intentional discrimination. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). In individual Title VII claims, statistical evidence is "relevant and important" but cannot alone sustain a case of individual discrimination. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984).

A plaintiff asserting a retaliation claim under Title VII or the FCRA must show that (1) he engaged in protected activity, (2) he suffered an adverse action, and (3) a causal link exists between the protected activity and the adverse action. *Howard*, 605 F.3d at 1244 & n.4. A protected activity may involve opposing unlawful employment practices or participating in making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing regarding an unlawful employment practice. *Id.* (citing 42 U.S.C. § 2000e-3(a)). Establishing the causal link between a protected activity and adverse action is not difficult; a plaintiff need only show that the activity and adverse action are not wholly unrelated. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277-78 (11th Cir. 2008). In order to demonstrate the connection, a plaintiff must demonstrate that the decision maker was aware of the protected activity at the time that the adverse decision was

made.  *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008).  However, close temporal proximity between the protected activity and adverse action can satisfy the burden of demonstrating causation.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

If a plaintiff establishes a prima facie case of retaliation, an employer may offer legitimate reasons for the adverse action.  *McCann*, 526 F.3d at 1375.  If an employer does so, the plaintiff must then show that the employer's proffered reasons are pretext for impermissible retaliation by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the reasons that a reasonable factfinder could find them "unworthy of credence."  *Id.*

### 1. Plaintiffs' "Direct" Evidence Argument

At the outset, Plaintiffs argue that this Court should not apply the *McDonnell Douglas* test because that test is invalid when only direct evidence of discrimination is produced.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  Plaintiffs, however, relying on a variety of cases from outside of this Circuit, seek to define "direct evidence" expansively to include all evidence, including circumstantial and statistical, "that shows some link between adverse action and alleged discriminatory behavior."  D.E. 84 at 3.

Whether Plaintiffs have correctly interpreted these other courts' decisions is unimportant, though, because Eleventh Circuit precedent clearly defines direct evidence in a much narrower sense than Plaintiffs.  As noted, direct evidence must link an employer's attitude to the actual discriminatory or retaliatory act complained of by the employee.  *Wilson*, 376 F.3d at 1086.  It must be "evidence, that, if believed, proves the existence of a fact without inference or presumption."  *Id.* "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."  *Id.* (internal quotation marks omitted) (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)).  If the

evidence merely suggests, but does not prove, a discriminatory motive, then it is indirect, circumstantial evidence. *Id.*; *Hamilton*, 680 F.3d at 1320.

Therefore, to the extent that Plaintiffs insist that circumstantial evidence is direct evidence and thus obviates the need for the *McDonnell Douglas* framework, the Court disagrees. However, as noted, the *McDonnell Douglas* framework is not the sole means by which a Title VII plaintiff may use circumstantial evidence to defeat summary judgment. *Hamilton*, 680 F.3d at 1320.

### 2. Shedrick's Discrimination Claim

Defendant contends that it is entitled to summary judgment on Shedrick's claims of discrimination in his termination[12] because he has failed to introduce direct evidence of discrimination, he cannot satisfy the prima facie elements of the *McDonnell Douglas* framework, and, even if he established a prima facie case, he has not shown that MDC's reasons for Shedrick's termination were pretextual. While the Court agrees that Shedrick has not produced direct evidence of discrimination in his discharge or satisfied the *McDonnell Douglas* framework, Shedrick has nonetheless introduced enough circumstantial evidence to raise a triable issue of fact concerning his discharge.

As discussed above, direct evidence must link an employer's attitude to the actual discriminatory or retaliatory act complained of by the employee without inference or presumption. *Wilson*, 376 F.3d at 1086. Under the *McDonnell Douglas* framework, a plaintiff need not produce direct evidence of discrimination, but as an initial matter, must establish a prima facie case of

---

[12] Defendant does not address Shedrick's claims relating to a hostile work environment, instead focusing solely on Shedrick's termination. *See* D.E. 75 at 19-24. Although Plaintiffs do not clearly say so, it appears from their response that they have not abandoned the hostile-work-environment claims. *See* D.E. 84 at 13 ("[A]ll four Plaintiffs claim they were constantly harassed or disciplined, and ultimately terminated or forced to resign."). Thus, because Defendant has not attempted to demonstrate the absence of any dispute of material fact regarding the hostile-work-environment claims, summary judgment would be inappropriate.

discrimination through circumstantial evidence by showing "(1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997) (citations omitted).  When an employee is discharged or disciplined for misconduct and there is no claim that the employee did not engage in the misconduct, a "plaintiff must show 'that he engaged in misconduct similar to that of a person outside the protected class, and . . . the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.'" *Rioux*, 520 F.3d at 1276 (omission in original) (citations omitted).

While the *McDonnell Douglas* framework is a common means of analyzing Title VII discrimination claims, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lockheed-Martin Corp.*, 644 F.3d at 1238.  A plaintiff will survive summary judgment if he produces circumstantial evidence that permits a reasonable inference that the decision maker acted with discriminatory intent.  *Id.*

At the outset, the Court notes that Plaintiffs have pointed to no direct evidence that Shedrick was fired because of his race.  Similarly, the Court agrees with Defendant that Shedrick has failed to establish the third prong of the *McDonnell Douglas* test because he has not demonstrated that any non-black custodian at MDC with a similar disciplinary history was treated more favorably than he was.  Although Plaintiffs claim that Hispanics generally were treated more favorably than Plaintiffs, *see* D.E. 84 at 13, Plaintiffs have not pointed to a Hispanic (or other non-black) custodian who was not fired after calling in sick and then attending a campus party during his or her working hours.  In the absence of such a comparator, Shedrick cannot establish a prima facie case under *McDonnell*

*Douglas.*  Yet Shedrick's inability to point to a comparator is not fatal to his claims if he can produce circumstantial evidence of the decision maker's discriminatory intent.

To begin with, the Court concludes that there is a material dispute over the identity of the decision maker who decided that Shedrick would be terminated or given the option to resign after the holiday-party incident.  Defendant has produced an affidavit from Bettie Thompson, an Associate Vice Provost of Human Resources, indicating that she made the decision to terminate Shedrick based on the holiday-party incident and Shedrick's other past infractions.  D.E. 75-9.  Plaintiffs contest that Thompson was the sole decision maker, however, and contend that Wood recommended Shedrick's termination.  D.E. 85, Shedrick, ¶ 10 & n.6.  In this regard, Plaintiffs point to the deposition of Dean Baez, who testified that although she did not remember who recommended Shedrick's termination, "Tina [Wood] was more involved at that point with this."  *See* D.E. 76-7 at 129:5-14.

Although Thompson may have been the final decision maker, Defendant has not attempted to controvert that Wood recommended Shedrick's termination to Thompson before she made that final decision.  *See* D.E. 88 at 12.  Under the "cat's paw" theory, an innocent decision maker may be a "mere conduit" for the discriminatory animus of the biased recommender.  *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999).  On the current record, therefore, the Court cannot conclude that there is no material question regarding Wood's involvement (or non-involvement) in recommending Shedrick's termination.

The role of Wood in Shedrick's termination becomes important because Plaintiffs have produced uncontroverted evidence that Wood has a bias against African Americans.  D.E. 85, Additional Facts, ¶ 1.  Similarly, Plaintiffs have produced circumstantial evidence that Wood has previously sought to remove black employees by fabricating legitimate causes for their discharge.  *Id.* ¶ 2.  While Defendant asserts that Ramirez's affidavit is not "probative" because Ramirez worked

with Wood after Shedrick (and the other Plaintiffs) left MDC, the Court disagrees.  To the contrary, Ramirez's affidavit is relevant to establishing Wood's bias.

Thus, from the record established so far in this case, the circumstantial evidence produced by Plaintiffs gives rise to a triable issue concerning whether Wood possessed a bias against Shedrick because of his race and whether Wood convinced Thompson to terminate Shedrick because of his race.  Accordingly, summary judgment is denied with respect to Shedrick's discrimination claims.

*3. Shedrick's Retaliation Claim*

Although Shedrick has not set forth discrete facts concerning the protected activity in which he engaged, a review of the record reveals two instances.  First, in June 2008, Shedrick complained informally and formally to officials at MDC about racial discrimination in the custodial department. *See* D.E. 7, ¶¶ 83, 85; D.E. 75 at 38; D.E. 84-26.  Second, Shedrick filed his EEOC charge on January 9, 2009, before he resigned, and before he submitted his resignation letter.[13]  D.E. 76-1 at 113; D.E. 75-1.  Similarly, the Court discerns two adverse actions that could be attributable to these protected activities: Shedrick's thirty-day suspension in August 2008 and the resign-or-be-terminated ultimatum in January 2009.

In both cases, temporal proximity alone permits Shedrick to establish a prima facie causal link.  Shedrick's placement on probation occurred approximately two months after his formal complaint was lodged, which is sufficient to establish causation.  *See Robinson v. LaFarge N. Am., Inc.*, 240 F. App'x 824, 829 (11th Cir. 2007).  Similarly, Shedrick submitted his resignation letter a mere three days after filing his EEOC charge, easily establishing proximity by causation.

---

[13] Defendant appears to be mistaken when it insists that all four Plaintiffs were terminated or had resigned before they filed their EEOC charge.  Shedrick's and Mitchell's EEOC charges are clearly dated before they left their employment at MDC.  *See* D.E. 76-1 at 113; D.E. 75-1; D.E. 75-24; 75-27.

In both cases, Defendant has proffered legitimate reasons for the adverse actions. MDC contends that Shedrick was placed on probation in August 2008 because he did not timely respond to attempts to contact him when his services were needed on campus around the time of Tropical Storm Fay. D.E. 75, Shedrick, ¶ 8; D.E. 75-7. Defendant also contends that Shedrick was given the choice between resignation or termination after he called in sick but proceeded to attend a campus party during his working hours. D.E. 75, Shedrick, ¶ 10.

Plaintiffs blanketly assert that any reasons given by Defendant are pretext because Defendant has a "pattern and practice of baselessly handing out discipline and adverse actions in an effort to get rid of Plaintiffs." D.E. 84 at 23. Plaintiffs have not addressed pretext in Shedrick's situation specifically. Despite Plaintiffs' shortcomings, however, the Court finds that the record does not support granting summary judgment on the retaliation claims.

First, regarding the probation incident, Shedrick contends that another African-American custodian, Roosevelt Austin, did not show up to work when contacted in August 2008 but nevertheless was not disciplined. D.E. 76-1 at 93:8-94:22. Defendant does not dispute this occurred but, instead, argues that because Austin is in the same protected class as Shedrick, the fact that Austin was not punished is irrelevant. However, Defendant conflates the test for discrimination with the test for retaliation. Plaintiffs need not show a comparator to prevail on a retaliation claim. Thus, the record reveals an uncontroverted assertion that a different employee—who apparently did not engage in protected activity—was not punished for the same misconduct that Shedrick—who had filed a protected complaint of racial discrimination—engaged in. A reasonable factfinder could infer that Shedrick's probation was pretextual from this, and, accordingly, summary judgment is inappropriate.

Second, as discussed above, there are material questions of fact regarding who terminated,

or recommended the termination of, Shedrick and what role, if any, bias played in the termination. Because these questions are outstanding, and because Defendant did not address Shedrick's termination in light of his pre-termination EEOC charge in its motion for summary judgment, the Court concludes that summary judgment would be inappropriate on this claim as well.

### 4. Mitchell's Discrimination Claims[14]

Defendant asserts that it is entitled to summary judgment on Mitchell's discriminatory-discharge claim because Mitchell cannot establish a prima facie case of discrimination in MDC's reduction-in-force decision. D.E. 75 at 34-37. The Court agrees.

Because Mitchell was discharged as part of a reduction in force, he must establish a prima facie case of discrimination by "(1) showing that he was a member of a protected group and was adversely affected by an employment decision; (2) proving that he was qualified for his own position or to assume another position at the time of the discharge; and (3) producing sufficient evidence from which a rational fact finder could conclude that his employer intended to discriminate against him in making the discharge decision." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998). To establish intent under the third element, a plaintiff must proffer evidence that the defendant (1) consciously refused to consider retaining the plaintiff because of his race or (2) regarded race as a negative factor in the retention consideration. *See Padilla v. N. Broward Hosp. Dist.*, 270 F. App'x 966, 971 (11th Cir. 2008).

Here, Mitchell fails to establish the discriminatory intent of the decision makers who eliminated his position during the reduction in force. Although Mitchell asserts that the "mass layoff

---

[14] As with Shedrick, Defendant has not addressed Mitchell's hostile-work-environment claims in its summary-judgment motion. Because Defendant has not attempted to demonstrate the absence of any dispute of material fact regarding the hostile-work-environment claims, summary judgment would be inappropriate regarding those claims.

was perpetrated with the same racial discrimination against African-Americans as alleged throughout the Complaint because new Hispanic employees got to keep their positions, as opposed to African-American employees who were laid off," D.E. 85, Mitchell, ¶ 7, this fact alone does not demonstrate that race was regarded as a negative factor by the decision makers or that Mitchell himself was not retained because of his race.

Plaintiffs have come forward with no evidence that Vice Provost of Human Resources Iliana Castillo-Frick held any negative feelings towards Mitchell specifically or African Americans generally, on account of race. And while Plaintiffs have produced a plethora of circumstantial evidence regarding racial bias among custodial-services officials, Plaintiffs have not pointed to any evidence that those individuals were involved in selecting Mitchell's position for elimination. Because Plaintiffs have not carried their burden of establishing a prima facie case, Defendant is entitled to summary judgment on Mitchell's discrimination claims to the extent that he contends that he was unlawfully discriminated against by way of the reduction in force.

## 5. Mitchell's Retaliation Claims

Defendant argues that Mitchell cannot state a retaliation claim under Title VII or the FCRA because he cannot establish prima facie causation or demonstrate that the reduction-in-force decision was pretext for retaliation. D.E. 75 at 40-41. The Court need not address the prima facie case because the Court agrees that Mitchell has not raised a material dispute over whether the reduction in force was pretext.

To demonstrate that the reduction-in-force termination was pretext for retaliation, Mitchell must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the reduction-in-force rationale. *See McCann*, 526 F.3d at 1375. The only protected activity that Mitchell has seemingly engaged in is the submission of his EEOC charge in April 2009. D.E. 84 at

22. Mitchell has not, however, pointed to any facts suggesting the reduction-in-force was retaliatory or, for that matter, demonstrated any weaknesses or inconsistencies in the reduction-in-force decision. In fact, in Mitchell's deposition, although he questioned why one single Hispanic employee was not terminated, he indicated that he believes the budgetary reduction-in-force rationale was legitimate. *See* D.E. 76-2 at 130:3 - :8. Plaintiffs' failure to point to any facts that would suggest that the reduction-in-force was pretext for retaliation means that Defendant is entitled to summary judgment on Mitchell's retaliation claims.

**F. Plaintiffs' "Rules" Argument**

Plaintiffs assert that the Court should deny Defendant's summary-judgment motion because Defendant failed to comply with the Court's rules and orders. D.E. 84 at 28. Specifically, Plaintiffs complain that Defendant is not permitted to combine its summary judgment motion and statement of material facts into a single document, and because it did, the Court should "exercise its discretion" and deny summary judgment. *Id.*

The Court has already addressed Plaintiffs' objection and found it unavailing. *See* D.E. 87 at 1 n.1. As stated there, neither the Local Rules nor this Court's prior order [D.E. 74] compels Defendant to file its motion and statement as separate documents. The Court's order permitted but did not require Defendant to file a single thirty-page motion and single twenty-page statement. As long as a distinct statement of material facts that complies with the provisions of Local Rule 56.1(a) accompanies the motion, it is irrelevant whether it is filed separately or incorporated into a single document. Here, Defendant's eleven-page statement of material facts complies with Local Rule 56.1(a) and the Court's twenty-page length requirement. D.E. 75 at 4-14. It is also worth noting that the Court has already observed that Plaintiffs' own opposition brief plainly violated the Local Rules but nonetheless permitted Plaintiffs to file it. D.E. 87 at 2 & n.2.

31

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that Defendant's Motion for Summary Judgment [D.E. 75] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Summary judgment is **GRANTED** in favor of Defendant on Count III, Plaintiffs' claims under 42 U.S.C. § 1981;

2. Summary judgment is **GRANTED** in favor of Defendant on the question of punitive damages. Plaintiffs may not recover punitive damages against Defendant;

3. Summary judgment is **GRANTED** in favor of Defendant on all other counts with respect to Plaintiffs John Williams and Milton Davis;

4. Summary judgment is **DENIED** with respect to Plaintiff Shack Shedrick's discrimination claims (Counts I and IV) and his retaliation claims (Counts II and V);

5. Summary judgment is **GRANTED** with respect to Plaintiff Jerome Mitchell's discrimination (Counts I and IV) and retaliation (Counts II and V) claims as they arise out of his reduction-in-force termination. Summary judgment is **DENIED** with respect to Mitchell's discrimination and retaliation counts to the extent that those claims are independent of Mitchell's termination.

It is further **ORDERED** that Plaintiffs' Motion to Set Trial Date [D.E. 97] is **GRANTED**. Trial on the remaining claims of Plaintiffs Shedrick and Mitchell is set for the two-week trial period beginning **May 28, 2013.**

**DONE** and **ORDERED** at Fort Lauderdale, Florida, this 23rd day of April 2013.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

cc:    counsel of record